# VIRGINIAN RAILWAY CO. *v.* SYSTEM FEDERATION NO. 40, RAILWAY EMPLOYEES DEPARTMENT OF THE AMERICAN FEDERATION OF LABOR, ET AL.

No. 324. Argued February 8, 9, 1937.—Decided March 29, 1937.

*Mr. James Piper* opened, and *Mr. H. T. Hall* concluded, the argument for petitioner. *Messrs. W. H. T. Loyall* and *John C. Donnally* were also on the petitioner's brief from which the following summary is taken.

520

522

524

*Mr. Frank L. Mulholland,* with whom *Messrs. S. M. Brandt* and *Willard H. McEwen* were on the brief, for respondents.

526

528

*Solicitor General Reed,* with whom *Attorney General Cummings* and *Messrs. Charles E. Wyzanski, Jr., Wendell*

*Berge, Leo F. Tierney,* and *Robert L. Stern* were on the brief, on behalf of the United States, as *amicus curiae,* by special leave of Court.

536

MR. JUSTICE STONE delivered the opinion of the Court.

This case presents questions as to the constitutional validity of certain provisions of the Railway Labor Act of May 20, 1926, c. 347, 44 Stat. 577, as amended by the Act of June 21, 1934, c. 691, 48 Stat. 1185, 45 U. S. C. §§ 151–163, and as to the nature and extent of the relief which courts are authorized by the Act to give.

Respondents are System Federation No. 40, which will be referred to as the Federation, a labor organization affiliated with the American Federation of Labor and representing shop craft employees of petitioner railway, and certain individuals who are officers and members of the System Federation. They brought the present suit in equity in the District Court for Eastern Virginia, to compel petitioner, an interstate rail carrier, to recognize and treat with respondent Federation, as the duly accredited representative of the mechanical department employees of petitioner, and to restrain petitioner from in any way interfering with, influencing or coercing its shop craft employees in their free choice of representatives, for the purpose of contracting with petitioner with respect to rules, rates of pay and working conditions, and for the purpose of considering and settling disputes between petitioner and such employees.

The history of this controversy goes back to 1922, when, following the failure of a strike by petitioner's shop employees affiliated with the American Federation of Labor, other employees organized a local union known as the "Mechanical Department Association of the Virginian Railway." The Association thereupon entered into an agreement with petitioner, providing for rates of pay and working conditions, and for the settlement of disputes with respect to them, but no substantial grievances were ever presented to petitioner by the Association. It maintained its organization and held biennial elections of officers, but the notices of election were sent out by petitioner and all Association expenses were paid by petitioner.

In 1927 the American Federation of Labor formed a local organization, which, in 1934, demanded recognition by petitioner of its authority to represent the shop craft employees, and invoked the aid of the National Mediation Board, constituted under the Railway Labor Act as amended, to establish its authority. The Board, pursuant to agreement between the petitioner, the Federation, and the Association, and in conformity to the statute; held an election by petitioner's shop craft employees, to choose representatives for the purpose of collective bargaining with petitioner. As the result of the election, the Board certified that·the Federation was the duly accredited representative of petitioner's employees in the six shop crafts.

Upon this and other evidence, not now necessary to be detailed, the trial court found that the Federation was the duly authorized representative of the mechanical department employees of petitioner, except the carmen and coach cleaners; that the petitioner, in violation of § 2 of the Railway Labor Act, had failed to treat with the Federation as the duly accredited representative of petitioner's employees; that petitioner had sought to influence its employees against any affiliation with labor organizations other than an association maintained by petitioner, and to

prevent its employees from exercising their right to choose their own representative; that for that purpose, following the certification by the National Mediation Board, of the Federation, as the duly authorized representative of petitioner's mechanical department employees, petitioner had organized the Independent Shop Craft Association of its shop craft employees, and had sought to induce its employees to join the independent association, and to put it forward as the authorized representative of petitioner's employees. [1]

Upon the basis of these findings the trial court gave its decree applicable to petitioner's mechanical department employees except the carmen and coach cleaners. It directed petitioner to "treat with" the Federation and to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, . . ." It restrained petitioner from "entering into any contract, undertaking or agreement of whatsoever kind concerning rules, rates of pay or working conditions affecting its Mechanical Department employees, . . . except . . . with

---

[1] The court found that after the certification by the Mediation Board "the defendant, by and through its officers, agents and servants, undertook by means of the circulation of a petition or petitions addressed to the National Mediation Board to have the certification of the National Mediation Board aforesaid altered, changed or revoked so as to deprive its Mechanical Department employes of the right to representation by said System Federation No. 40, Railway Employes Department of the American Federation of Labor, so designated as aforesaid, and thereafter did cause to be organized the Independent Shop Crafts Association by individual Mechanical Department employes by circulating or causing to be circulated applications for membership in said Independent Shop Crafts Association notwithstanding the certification as aforesaid by the National Mediation Board of said System Federation No. 40, Railway Employes Department of the American Federation of Labor, as the authorized representative of its Mechanical Department employes, . . ."

the Federation," and from "interfering with, influencing or coercing" its employees with respect to their free choice of representatives "for the purpose of making and maintaining contracts" with petitioner "relating to rules, rates of pay, and working conditions or for the purpose of considering and deciding disputes between the Mechanical Department employees" and petitioner. The decree further restrained the petitioner from organizing or fostering any union of its mechanical department employees for the purpose of interfering with the Federation as the accredited representative of such employees. 11 F. Supp. 621.

On appeal the Court of Appeals for the Fourth Circuit approved and adopted the findings of the district court and affirmed its decree. 84 F. (2d) 641. This Court granted certiorari to review the cause as one of public importance.

Petitioner here, as below, makes two main contentions: First, with respect to the relief granted, it maintains that § 2, Ninth, of the Railway Labor Act, which provides that a carrier shall treat with those certified by the Mediation Board to be the representatives of a craft or class, imposes no legally enforcible obligation upon the carrier to negotiate with the representative so certified, and that in any case the statute imposes no obligation to treat or negotiate which can be appropriately enforced by a court of equity. Second, that § 2, Ninth, in so far as it attempts to regulate labor relations between petitioner and its "back shop" employees, is not a regulation of interstate commerce authorized by the commerce clause because, as it asserts, they are engaged solely in intrastate activities; and that so far as it imposes on the carrier any obligation to negotiate with a labor union authorized to represent its employees, and restrains it from making agreements with any' other labor organization, it is a denial of due process guaranteed by the Fifth Amendment. Other minor objections to the decree, so far as relevant to

our decision, will be referred to later in the course of this opinion.

The concurrent findings of fact of the two courts below are not shown to be plainly erroneous or unsupported by evidence. · We accordingly accept them as the conclusive basis for decision, *Texas & N. O. R. Co.* v. *Brotherhood of Railway & S. S. Clerks,* 281 U. S. 548, 558; *Pick Mfg. Co.* v. *General Motors Corp.,* 299 U. S. 3, 4, and address ourselves to the questions of law raised on the record.

*First. The Obligation Imposed by the Statute.* By Title III of the Transportation Act of February 28, 1920, c. 91, 41 Stat. 456, 469, Congress set up the Railroad Labor Board as a means for the peaceful settlement, by agreement or by arbitration, of labor controversies between interstate carriers and their employees. It sought "to encourage settlement without strikes, first by conference between the parties; failing that, by reference to adjustment boards of the parties' own choosing, and if this is ineffective, by a full hearing before a National Board . . ." *Pennsylvania R. Co.* v. *Railroad Labor Board,* 261 U. S. 72, 79. The decisions of the Board were supported by no legal sanctions. The disputants were not "in any way to be forced into compliance with the statute or with the judgments pronounced by the Labor Board, except through the effect of adverse public opinion." *Pennsylvania Federation* v. *Pennsylvania R. Co.,* 267 U. S. 203, 216.

In 1926 Congress, aware of the impotence of the Board, and of the fact that its authority was generally not recognized or respected by the railroads or their employees, made a fresh start toward the peaceful settlement of labor disputes affecting railroads, by the repeal of the 1920 Act and the adoption of the Railway Labor Act. Report, Senate Committee on Interstate Commerce, No. 222, 69th Cong., 1st Sess. *Texas & N. O. R. Co.* v. *Brotherhood of Railway & S. S. Clerks, supra,* 563. By the new measure Congress continued its policy of encouraging the amicable adjustment of labor disputes by their voluntary submis-

sion to arbitration before an impartial board, but it supported that policy by the imposition of legal obligations. It provided means for enforcing the award obtained by arbitration between the parties to labor disputes. § 9. In certain circumstances it prohibited any change in conditions, by the parties to an unadjusted labor dispute, for a period of thirty days, except by agreement. § 10. It recognized their right to designate representatives for the purposes of the Act "without interference, influence or coercion exercised by either party over the self-organization or designation of representatives by the other." § 2, Third. Under the last-mentioned provision this Court held, in the *Railway Clerks* case, *supra*, that employees were free to organize and to make choice of their representatives without the "coercive interference" and "pressure" of a company union organized and maintained by the employer; and that the statute protected the freedom of choice of representatives, which was an essential of the statutory scheme, with a legal sanction which it was the duty of courts to enforce by appropriate decree.

The prohibition against such interference was continued and made more explicit by the amendment of 1934.[2] Petitioner does not challenge that part of the

---

[2] Section 2 of the Act, as amended in 1934, declares that its purposes, among others, are "(2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization" and "(3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this Act." The section was also amended to provide that "neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives," § 2, Third, and that "it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization . . . or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization." § 2, Fourth.

decree which enjoins any interference by it with the free choice of representatives by its employees, and the fostering, in the circumstances of this case, of the company union. That contention is not open to it in view of our decision in the *Railway Clerks* case, *supra*, and of the unambiguous language of § 2, Third, and Fourth, of the Act, as amended.

But petitioner insists that the statute affords no legal sanction for so much of the decree as directs petitioner to "treat with" respondent Federation "and exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes whether arising out of the application of such agreements or otherwise." It points out that the requirement for reasonable effort to reach an agreement is couched in the very words of § 2, First, which were taken from § 301 of the Transportation Act, and which were held to be without legal sanction in that Act. *Pennsylvania Federation* v. *Pennsylvania R. Co., supra*, 215. It is argued that they cannot now be given greater force as reënacted in the Railway Labor Act of 1926, and continued in the 1934 amendment. But these words no longer stand alone and unaided by mandatory provision of the statute as they did when first enacted. The amendment of the Railway Labor Act added new provisions in § 2, Ninth, which makes it the duty of the Mediation Board, when any dispute arises among the carrier's employees, "as to who are the representatives of such employees," to investigate the dispute and to certify, as was done in this case, the name of the organization authorized to represent the employees. It commands that "Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act."

It is, we think, not open to doubt that Congress intended that this requirement be mandatory upon the railroad employer, and that its command, in a proper case, be enforced by the courts. The policy of the Transportation Act of encouraging voluntary adjustment of labor disputes, made manifest by those provisions of the Act which clearly contemplated the moral force of public opinion as affording its ultimate sanction, was, as we have seen, abandoned by the enactment of the Railway Labor Act. Neither the purposes of the later Act, as amended, nor its provisions when read, as they must be, in the light of our decision in the *Railway Clerks* case, *supra,* lend support to the contention that its enactments, which are mandatory in form and capable of enforcement by judicial process, were intended to be without legal sanction.[3]

Experience had shown, before the amendment of 1934, that when there was no dispute as to the organizations authorized to represent the employees, and when there was willingness of the employer to meet such representative for a discussion of their grievances, amicable adjustment of differences had generally followed and strikes had been avoided.[4] On the other hand, a prolific source of dispute had been the maintenance by the railroads of company unions and the denial by railway management

[3] The 1934 amendment imposed various other obligations upon the carrier, to which criminal penalties were attached [§ 2, Tenth]—*e. g.,* prohibitions against helping unions, by contributions of funds, or assistance in the collection of dues, § 2, Fourth; against requiring employees to promise to join or not to join a labor union, § 2, Fifth; against changing rates of pay, etc., without specifying a conference upon thirty days' notice, § 2, Seventh; and see the requirement that the carrier post notices that all disputes will be determined in accordance with the Act, § 2, Eighth.

[4] In the first two years after the enactment of the Railway Labor Act of 1926, 363 cases concerning rates of pay, rules or working conditions were submitted to the United States Board of Mediation, and

of the authority of representatives chosen by their employees. Report of House Committee on Interstate and Foreign Commerce, No. 1944, 73rd Cong., 2d Sess., pp. 1–2.[5] Section 2, Ninth, of the amended Act, was specifically aimed at this practice. It provided a means for ascertaining who are the authorized representatives of the employees through intervention and certification by the Mediation Board, and commanded the carrier to treat with the representative so certified. That the command was limited in its application to the case of intervention

about 25% of these were withdrawn by the parties. Yet, during the same period, more than 600 direct and voluntary settlements were negotiated. See United States Board of Mediation, First Annual Report, For the Fiscal Year Ended June 30, 1927, pp. 10–11; Second Annual Report, For the Fiscal Year Ended June 30, 1928, pp. 11, 58–59. Compare National Mediation Board, Second Annual Report, For the Fiscal Year Ended June 30, 1936, at p. 1: "For every dispute submitted to . . . these Boards, there were many others considered and settled in conferences between representatives of carriers and of the employees as required by section 2, second, of the Act."

See also testimony of William M. Leiserson, Chairman of the National Mediation Board until February 1, 1937, at Hearing by National Labor Relations Board in the case of Jones & Laughlin Steel Corporation, 301 U. S. 1: "If we have a threat of a strike now [on the railroads] it might be on a big fundamental question, like wages and hours, and we usually find we can settle those by arbitration or otherwise. . . . But if the issues involved were discrimination or discharge of men because they had joined the organization, or the question would be the right of the organization to represent them, we could not have settled those strikes." See Governmental Protection of Labor's Right to Organize, National Labor Relations Board, Division of Economic Research, Bull. No. 1, August, 1936, pp. 17–18.

[5] See also statement by Representative Crosser, in charge of the bill on the floor, in Hearings, House Committee on Rules, 73d Cong., 2d Sess., on H. R. 9861, pp. 10–11, 13: "The purpose of the bill is . . . [*inter alia*] to outlaw the attempt that has been made in numerous instances by employers who control alleged labor unions, and thereby, to use a slang phrase, to 'gum up the works', . . . We have had 8

and certification by the Mediation Board indicates not that its words are precatory, but only that Congress hit at the evil "where experience shows it to be most felt." *Keokee Coke Co.* v. *Taylor,* 234 U. S. 224, 227.

Petitioner argues that the phrase "treat with" must be taken as meaning "regard" or "act towards," so that compliance with its mandate requires the employer to meet the authorized representative of the employees only if and when he shall elect to negotiate with them. This suggestion disregards the words of the section, and ignores the plain purpose made manifest throughout the numerous provisions of the Act. Its major objective is the avoidance of industrial strife, by conference between the authorized representatives of employer and employee. The command to the employer to "treat with" the authorized representative of the employees adds nothing to the 1926 Act, unless it requires some affirmative act on the part of the employer. Compare the *Railway Clerks* case, *supra.* As we cannot assume that its addition to the statute was purposeless, we must take its meaning to be that which the words suggest, which alone would add something to the statute as

years of operation of this act, and we have prevented any strikes. But strikes have been threatened because of the defects which have been found in this bill."

Under the 1926 Act disputes over the designation of employee representatives could be dealt with by the old United States Mediation Board only by agreement of the parties. The carriers agreed to an election conducted by the Board but nine times in six years, see testimony of William M. Leiserson, Chairman of the National Mediation Board until February 1, 1937, at Hearing by National Labor Relations Board in the case of Jones & Laughlin Steel Corp., 301 U. S. 1; Governmental Protection of Labor's Right to Organize, National Labor Relations Board, Division of Economic Research, Bull. No. 1, August, 1936, p. 50. The 1934 amendment was followed by a large increase in the number of representation disputes submitted to the National Mediation Board. See *infra,* Note 7.

it was before amendment, and which alone would tend to effect the purpose of the legislation. The statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose differences—in short, to enter into a negotiation for the settlement of labor disputes such as is contemplated by § 2, First.

Petitioner's insistence that the statute does not warrant so much of the decree as forbids it to enter into contracts of employment with its individual employees is based upon a misconstruction of the decree. Both the statute and the decree are aimed at securing settlement of labor disputes by inducing collective bargaining with the true representative of the employees and by preventing such bargaining with any who do not represent them. The obligation imposed on the employer by § 2, Ninth, to treat with the true representative of the employees as designated by the Mediation Board, when read in the light of the declared purposes of the Act, and of the provisions of § 2, Third and Fourth, giving to the employees the right to organize and bargain collectively through the representative of their own selection, is exclusive. It imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other. We think, as the Government concedes in its brief,[6] that

[6] (Note 35a.) "The Government interprets the negative obligations imposed by the statute and decree as having the following effect:

"When the majority of a craft or class has (either by secret ballot or otherwise) selected a representative, the carrier cannot make with anyone other than the representative a collective contract (i. e., a contract which sets rates of pay, rules, or working conditions),

the injunction against petitioner's entering into any contract concerning rules, rates of pay and working conditions, except with respondent, is designed only to prevent collective bargaining with anyone purporting to represent employees, other than respondent, who has been ascertained to be their true representative. When read in its context it must be taken to prohibit the negotiation of labor contracts, generally applicable to employees in the mechanical department, with any representative other than respondent, but not as precluding such individual contracts as petitioner may elect to make directly with individual employees. The decree, thus construed, conforms, in both its affirmative and negative aspects, to the requirements of § 2.

*Propriety of Relief in Equity.* Petitioner contends that if the statute is interpreted as requiring the employer to negotiate with the representative of his employees, its obligation is not the appropriate subject of a decree in equity; that negotiation depends on desires and mental attitudes which are beyond judicial control, and that since equity cannot compel the parties to agree, it will not

whether the contract covers the class as a whole or a part thereof. Neither the statute nor the decree prevents the carrier from refusing to make a collective contract and hiring individuals on whatever terms the carrier may by unilateral action determine. In hirings of that sort the individual does not deal in a representative capacity with the carrier and the hiring does not set general rates of pay, rules, or working conditions. Of course, as a matter of voluntary action, not as a result of the statute or the decree, the carrier may contract with the duly designated representative to hire individuals only on the terms of a collective understanding between the carrier and the representative; but any such agreement would be entirely voluntary on the carrier's part and would in no sense be compelled.

"If the majority of a craft or class has not selected a representative, the carrier is free to make with anyone it pleases and for any group it pleases contracts establishing rates of pay, rules, or working conditions."

compel them to take the preliminary steps which may result in agreement.

There is no want of capacity in the court to direct complete performance of the entire obligation: both the negative duties not to maintain a company union and not to negotiate with any representative of the employees other than respondent and the affirmative duty to treat with respondent. Full performance of both is commanded by the decree in terms which leave in no uncertainty the requisites of performance. In compelling compliance with either duty it does far less than has been done in compelling the discharge of a contractual or statutory obligation calling for a construction or engineering enterprise, *New Orleans, M. & T. Ry. Co.* v. *Mississippi,* 112 U. S. 12; *Wheeling Traction Co.* v. *Board of Commissioners,* 248 Fed. 205; see *Gas Securities Co.* v. *Antero & Lost Park Reservoir Co.,* 259 Fed. 423, 433; *Board of Commissioners* v. *A. V. Wills & Sons,* 236 Fed. 362, 380; *Jones* v. *Parker,* 163 Mass. 564; 40 N. E. 1044, or in granting specific performance of a contract for the joint use of a railroad bridge and terminals, *Joy* v. *St. Louis,* 138 U. S. 1; *Union Pacific Ry. Co.* v. *Chicago, R. I. & P. Ry. Co.,* 163 U. S. 564; cf. *Prospect Park & Coney Island R. Co.* v. *Coney Island & Brooklyn R. Co.,* 144 N. Y. 152; 39 N. E. 17. Whether an obligation has been discharged, and whether action taken or omitted is in good faith or reasonable, are everyday subjects of inquiry by courts in framing and enforcing their decrees.

It is true that a court of equity may refuse to give any relief when it is apparent that that which it can give will not be effective or of benefit to the plaintiff. Equity will not decree the execution of a partnership agreement since it cannot compel the parties to remain partners, see *Hyer* v. *Richmond Traction Co.,* 168 U. S. 471, 482, or compel one to enter into performance of a contract of personal service which it cannot adequately control, *Marble Com-*

*pany* v. *Ripley,* 10 Wall. 339, 358; *Karrick* v. *Hannaman,* 168 U. S. 328, 336; *Tobey* v. *Bristol,* Fed. Cas. No. 14,065; *Weeks* v. *Pratt,* 43 F. (2d) 53, 57; Railway Labor Act, § 2, Tenth. But the extent to which equity will go to give relief where there is no adequate remedy at law is not a matter of fixed rule. It rests rather in the sound discretion of the court. *Willard* v. *Tayloe,* 8 Wall. 557, 565; *Joy* v. *St. Louis, supra,* 47; *Morrison* v. *Work,* 266 U. S. 481, 490; *Curran* v. *Holyoke Water Power Co.,* 116 Mass. 90, 92. Whether the decree will prove so useless as to lead a court to refuse to give it, is a matter of judgment to be exercised with reference to the special circumstances of each case rather than to general rules which at most are but guides to the exercise of discretion. It is a familiar rule that a court may exercise its equity powers, or equivalent mandamus powers, *United States ex rel. Greathouse* v. *Dern,* 289 U. S. 352, 359, to compel courts, boards, or officers to act in a matter with respect to which they may have jurisdiction or authority, although the court will not assume to control or guide the exercise of their authority. *Interstate Commerce Comm'n* v. *Humboldt S. S. Co.,* 224 U. S. 474; *Louisville Cement Co.* v. *Interstate Commerce Comm'n,* 246 U. S. 638; see *Work* v. *United States ex rel. Rives,* 267 U. S. 175, 184; *Wilbur* v. *United States ex rel. Kadrie,* 281 U. S. 206, 218.

In considering the propriety of the equitable relief granted here, we cannot ignore the judgment of Congress, deliberately expressed in legislation, that where the obstruction of the company union is removed, the meeting of employers and employees at the conference table is a powerful aid to industrial peace. Moreover, the resources of the Railway Labor Act are not exhausted if negotiation fails in the first instance to result in agreement. If disputes concerning changes in rates of pay, rules or working conditions, are "not adjusted by the parties in conference," either party may invoke the mediation services of the

Mediation Board, § 5, First, or the parties may agree to seek the benefits of the arbitration provision of § 7. With the coercive influence of the company union ended, and in view of the interest of both parties in avoiding a strike, we cannot assume that negotiation, as required by the decree, will not result in agreement, or lead to successful mediation or arbitration, or that the attempt to secure one or another through the relief which the district court gave is not worth the effort.

More is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern. That is testified to by the history of the legislation now before us, the reports of committees of Congress having the proposed legislation in charge, and by our common knowledge. Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved. *Pennsylvania* v. *Williams*, 294 U. S. 176, 185; *Central Kentucky Gas Co.* v. *Railroad Commission*, 290 U. S. 264, 270–273; *Harrisonville* v. *W. S. Dickey Clay Co.*, 289 U. S. 334, 338; *Beasley* v. *Texas & Pacific Ry. Co.*, 191 U. S. 492, 497; *Joy* v. *St. Louis, supra,* 47; *Texas & Pacific Ry. Co.* v. *Marshall,* 136 U. S. 393, 405–406; *Conger* v. *New York, W. S. & B. R. Co.,* 120 N. Y. 29, 32, 33; 23 N. E. 983. The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief. It is for similar reasons that courts, which traditionally have refused to compel performance of a contract to submit to arbitration, *Tobey* v. *Bristol, supra,* enforce statutes commanding performance of arbitration agreements. *Red Cross*

*Line* v. *Atlantic Fruit Co.*, 264 U. S. 109, 119, 121; *Marine Transit Corp.* v. *Dreyfus*, 284 U. S. 263, 278.

The decree is authorized by the statute and was granted in an appropriate exercise of the equity powers of the court.

*Second. Constitutionality of § 2 of the Railway Labor Act. (A) Validity Under the Commerce Clause.* The power of Congress over interstate commerce extends to such regulations of the relations of rail carriers to their employees as are reasonably calculated to prevent the interruption of interstate commerce by strikes and their attendant disorders. *Wilson* v. *New*, 243 U. S. 332, 347–348. The Railway Labor Act, § 2, declares that its purposes, among others, are "To avoid any interruption to commerce or to the operation of any carrier engaged therein," and "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules or working conditions." The provisions of the Act and its history, to which reference has been made, establish that such are its purposes, and that the latter is in aid of the former. What has been said indicates clearly that its provisions are aimed at the settlement of industrial disputes by the promotion of collective bargaining between employers and the authorized representative of their employees, and by mediation and arbitration when such bargaining does not result in agreement. It was for Congress to make the choice of the means by which its objective of securing the uninterrupted service of interstate railroads was to be secured, and its judgment, supported as it is by our long experience with industrial disputes, and the history of railroad labor relations, to which we have referred, is not open to review here.[7] The means chosen are appro-

---

[7] There was evidence available to Congress that the labor policy embodied in the Railway Labor Act had been successful in curbing strikes. In the eight years subsequent to the passage of the 1926 Act, there were only two small railroad strikes. Since the 1934

priate to the end sought and hence are within the congressional power.  See *Railway Clerks* case, *supra,* 570; *Railroad Retirement Board* v. *Alton R. Co.,* 295 U. S. 330, 369.

But petitioner insists that the Act as applied to its "back shop" employees is not within the commerce power since their duties have no direct relationship to interstate transportation.  Of the 824 employees in the six shop crafts eligible to vote for a choice of representatives, 322 work in petitioner's "back shops" at Princeton, West Virginia.  They are there engaged in making classified repairs, which consist of heavy repairs

amendment, there has been but one.  See National Mediation Board, First Annual Report, For the Fiscal Year Ended June 30, 1935, p. 8; Second Annual Report, For the Fiscal Year Ended June 30, 1936, p. 1.

In the water transportation and motor transportation fields, there were frequent strikes.  A table submitted by the United States [see Respondent's Brief, Associated Press *v.* National Labor Relations Board, No. 365, October Term 1936, p. 57], and derived from United States Department of Labor, Bureau of Labor Statistics, Bulletins No. R 339 (1936), p. 4; No. R. 389 (1936), p. 4; Monthly Labor Review (May–September, 1936), Monthly "Analysis of Strikes," shows the following:

| | Man-days of idleness due to labor strikes— | | | |
| --- | --- | --- | --- | --- |
| | 1933 | 1934 | 1935 | (1936 Jan.–May) |
| Water Transportation | 32, 752 | 1, 068, 867 | 749, 534 | 119, 820 |
| Motor Transportation | 155, 565 | 859, 657 | 202, 393 | 46, 054 |
| Railroads | 0 | 0 | 56 | 0 |

Yet there were many disputes between rail carriers and their employees.  Apart from the more trivial grievances and differences of opinion in the interpretation of agreements, 876 disputes, principally over changes in rates of pay, rules or working conditions, were referred to the United States Board of Mediation between 1926 and 1934.  The following table, derived from its Eighth Annual Report, For the Fiscal Year Ended June 30, 1934, pp. 4–5, indicates the suc-

on locomotives and cars withdrawn from service for that purpose for long periods (an average of 105 days for locomotives and 109 days for cars). The repair work is

cess of the mediation and arbitration machinery set up by the Railway Labor Act.

| Manner of Disposition | Fiscal Year Ending June 30, — | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1927 | 1928 | 1929 | 1930 | 1931 | 1932 | 1933 | 1934 | Total |
| Mediation Agreements............ | 57 | 84 | 46 | 25 | 24 | 45 | 23 | 17 | 321 |
| Withdrawn by Parties............ | 24 | 45 | 43 | 20 | 21 | 69 | 20 | 26 | 268 |
| Arbitration Agreements......... | 27 | 14 | 10 | 4 | 2 | 4 | 3 | 9 | 73 |
| Closed Account: | | | | | | | | | |
| Refusal to Arbitrate........... | 0 | 0 | 9 | 3 | 1 | 47 | 39 | 50 | 149 |
| Retired or closed, other causes.. | 3 | 2 | 21 | 10 | 5 | 5 | 10 | 9 | 65 |

But statistics show that many more labor disputes were settled by direct negotiation, *supra*, footnote 4, and Congress might reasonably have feared that the action of certain railroads in negotiating only with unions dominated by them would prevent such settlements and lead to strikes. See *supra*, footnote 5. That there were many disputes, apparent and latent, for which the 1926 Act had not provided adequate machinery, is shown by the large number of representation disputes (more than 230) referred to the National Mediation Board in the first two years of its existence, see First Annual Report, For the Fiscal Year Ended June 30, 1935, p. 9; Second Annual Report, For the Fiscal Year Ended June 30, 1936, pp. 5, 7.

It is the belief of the National Mediation Board that peace in the railroad industry is largely due to the 3,485 collective agreements covering rates of pay, rules and working conditions, which were filed by June 30, 1936 [see National Mediation Board, Second Annual Report, For the Fiscal Year Ended June 30, 1936, p. 26]. In its First Annual Report, For the Fiscal Year Ended June 30, 1935, it concluded (p. 36): "The absence of strikes in the railroad industry, particularly during the last two years when wide-spread strikes, the usual accompaniment of business recovery, prevailed throughout the country, is to be explained primarily not by the mediation machinery of the Railway Labor Act, but by the existence of these collective labor contracts. For, while they are in existence, these contracts provide orderly, legal processes of settling all disputes as a substitute for strikes and industrial warfare."

upon the equipment used by petitioner in its transportation service, 97% of which is interstate. At times a continuous stream of engines and cars passes through the "back shops" for such repairs. When not engaged in repair work, the back shop employees perform "store order work," the manufacture of material such as rivets and repair parts, to be placed in railroad stores for use at the Princeton shop and other points on the line.

The activities in which these employees are engaged have such a relation to the other confessedly interstate activities of the petitioner that they are to be regarded as a part of them. All taken together fall within the power of Congress over interstate commerce. *Baltimore & Ohio R. Co.* v. *Interstate Commerce Comm'n*, 221 U. S. 612, 619; cf. *Pedersen* v. *Delaware, L. & W. R. Co.*, 229 U. S. 146, 151. Both courts below have found that interruption by strikes of the back shop employees, if more than temporary, would seriously cripple petitioner's interstate transportation. The relation of the back shop to transportation is such that a strike of petitioner's employees there, quite apart from the likelihood of its spreading to the operating department, would subject petitioner to the danger, substantial, though possibly indefinable in its extent, of interruption of the transportation service. The cause is not remote from the effect. The relation between them is not tenuous. The effect on commerce cannot be regarded as negligible. See *United States* v. *Railway Employees' Department of the American Federation of Labor*, 290 Fed. 978, 981, holding participation of back shop employees in the nation-wide railroad shopmen's strike of 1922 to constitute an interference with interstate commerce. As the regulation here in question is shown to be an appropriate means of avoiding that danger, it is within the power of Congress.

It is no answer, as petitioner suggests, that it could close its back shops and turn over the repair work to independent contractors. Whether the railroad should do its repair work in its own shops, or in those of another, is a question of railroad management. It is petitioner's determination to make its own repairs which has brought its relations with shop employees within the purview of the Railway Labor Act. It is the nature of the work done and its relation to interstate transportation which afford adequate basis for the exercise of the regulatory power of Congress.

The *Employers' Liability Cases,* 207 U. S. 463, 498, which mentioned railroad repair shops as a subject beyond the power to regulate commerce, are not controlling here. Whatever else may be said of that pronouncement, it is obvious that the commerce power is as much dependent upon the type of regulation as its subject matter. It is enough for present purposes that experience has shown that the failure to settle, by peaceful means, the grievances of railroad employees with respect to rates of pay, rules or working conditions, is far more likely to hinder interstate commerce than the failure to compensate workers who have suffered injury in the course of their employment.

(B) *Validity of § 2 of the Railway Labor Act Under the Fifth Amendment.* The provisions of the Railway Labor Act applied in this case, as construed by the court below, and as we construe them, do not require petitioner to enter into any agreement with its employees, and they do not prohibit its entering into such contract of employment as it chooses, with its individual employees. They prohibit only such use of the company union as, despite the objections repeated here, was enjoined in the *Railway Clerks* case, *supra,* and they impose on petitioner only the affirmative duty of "treating with" the authorized representatives of its employees for the purpose of negotiating a labor dispute.

Even though Congress, in the choice of means to effect a permissible regulation of commerce, must conform to due process, *Railroad Retirement Board* v. *Alton R. Co., supra,* 347; *Chicago, R. I. & P. Ry. Co.* v. *United States,* 284 U. S. 80, 97; see *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555, 589, it is evident that where, as here, the means chosen are appropriate to the permissible end, there is little scope for the operation of the due process clause. The railroad can complain only of the infringement of its own constitutional immunity, not that of its employees. *Erie R. Co.* v. *Williams,* 233 U. S. 685, 697; *Jeffrey Mfg. Co.* v. *Blagg,* 235 U. S. 571, 576; *Rail & River Coal Co.* v. *Yaple,* 236 U. S. 338, 349; cf. *Hawkins* v. *Bleakly,* 243 U. S. 210, 214. And the Fifth Amendment, like the Fourteenth, see *West Coast Hotel Co.* v. *Parrish,* decided this day, *ante,* p. 379, is not a guarantee of untrammeled freedom of action and of contract. In the exercise of its power to regulate commerce, Congress can subject both to restraints not shown to be unreasonable. Such are the restraints of the safety appliance act, *Johnson* v. *Southern Pacific Co.,* 196 U. S. 1; of the act imposing a wage scale on rail carriers, *Wilson* v. *New, supra;* of the Railroad Employers' Liability Act, *Second Employers' Liability Cases,* 223 U. S. 1; of the act fixing maximum hours of service for railroad employees whose duties control or affect the movement of trains, *Baltimore & Ohio R. Co.* v. *Interstate Commerce Comm'n, supra;* of the act prohibiting the prepayment of seamen's wages, *Patterson* v. *Bark Eudora,* 190 U. S. 169.

Each of the limited duties imposed upon petitioner by the statute and the decree do not differ in their purpose and nature from those imposed under the earlier statute and enforced in the *Railway Clerks* case, *supra.* The quality of the action compelled, is reasonableness, and therefore the lawfulness of the compulsion, must be

judged in the light of the conditions which have occasioned the exercise of governmental power. If the compulsory settlement of some differences, by arbitration, may be within the limits of due process, see *Hardware Dealers Mutual Fire Ins. Co.* v. *Glidden Co.*, 284 U. S. 151, it seems plain that the command of the statute to negotiate for the settlement of labor disputes, given in the appropriate exercise of the commerce power, cannot be said to be so arbitrary or unreasonable as to infringe due process.

*Adair* v. *United States*, 208 U. S. 161, and *Coppage* v. *Kansas*, 236 U. S. 1, have no present application. The provisions of the Railway Labor Act invoked here neither compel the employer to enter into any agreement, nor preclude it from entering into any contract with individual employees. They do not "interfere with the normal exercise of the right of the carrier to select its employees or to discharge them." See the *Railway Clerks* case, *supra*, 571.

There remains to be considered petitioner's contentions that the certificate of the National Mediation Board is invalid and that the injunction granted is prohibited by the provisions of the Norris-LaGuardia Act, of March 23, 1932, c. 90, 47 Stat. 70; 29 U. S. C. §§ 101–115.

*Validity of the Certificate of the National Mediation Board.* In each craft of petitioner's mechanical department a majority of those voting cast ballots for the Federation. In the case of the blacksmiths the Federation failed to receive a majority of the ballots of those eligible to vote, although a majority of the craft participated in the election. In the case of the carmen and coach cleaners, a majority of the employees eligible to vote did not participate in the election. There has been no appeal from the ruling of the district court that the designation of the Federation as the representative of the carmen and coach cleaners was invalid. Petitioner as-

sails the certification of the Federation as the representative of the blacksmiths because less than a majority of that craft, although a majority of those voting, voted for the Federation.

Section 2, Fourth, of the Railway Labor Act provides: "The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this Act." Petitioner construes this section as requiring that a representative be selected by the votes of a majority of eligible voters. It is to be noted that the words of the section confer the right of determination upon a majority of those eligible to vote, but is silent as to the manner in which that right shall be exercised. Election laws providing for approval of a proposal by a specified majority of an electorate have been generally construed as requiring only the consent of the specified majority of those participating in the election. *Carroll County* v. *Smith,* 111 U. S. 556; *Douglass* v. *Pike County,* 101 U. S. 677; *Louisville & Nashivlle R. Co.* v. *County Court of Davidson County,* 1 Sneed (Tenn.) 637; *Montgomery County Fiscal Court* v. *Trimble,* 104 Ky. 629; 47 S. W. 773. Those who do not participate "are presumed to assent to the expressed will of the majority of those voting." *Cass County* v. *Johnston,* 95 U. S. 360, 369, and see *Carroll County* v. *Smith, supra.*

We see no reason for supposing that § 2, Fourth, was intended to adopt a different rule. If, in addition to participation by a majority of a craft, a vote of the majority of those eligible is necessary for a choice, an indifferent minority could prevent the resolution of a contest, and thwart the purpose of the Act, which is dependent for its operation upon the selection of representatives. There is the added danger that the absence of eligible voters may be due less to their indifference than to coercion by the employer. The opinion of the trial court discloses that the

Mediation Board scheduled an election to be determined by a majority of the eligible voters, but that the Federation's subsequent protest that the Railway was influencing the men not to vote caused the Board to hold a new election to be decided by the ballots of a majority of those voting.

It is significant of the congressional intent that the language of § 2, Fourth, was taken from a rule announced by the United States Railroad Labor Board, acting under the labor provisions of the Transportation Act of 1920, Decision No. 119, *International Association of Machinists* v. *Atchison, T. & S. F. Ry.,* 2 Dec. U. S. Railroad Labor Board, 87, 96, par. 15. Prior to the adoption of the Railway Labor Act, this rule was interpreted by the Board, in Decision No. 1971, *Brotherhood of Railway & S. S. Clerks* v. *Southern Pacific Lines,* 4 Dec. U. S. Railroad Labor Board 625, where it appeared that a majority of the craft participated in the election. The Board ruled, p. 639, that a majority of the votes cast was sufficient to designate a representative. A like interpretation of § 2, Fourth, was sustained in *Association of Clerical Employees* v. *Brotherhood of Railway & S. S. Clerks,* 85 F. (2d) 152.

The petitioner also challenges the validity of the certificate of the National Mediation Board in this case because it fails to state the number of eligible voters in each craft or class. The certificate states that respondent "has been duly designated and authorized to represent the mechanical department employees" of petitioner. It also shows on its face the total number of votes cast in each craft in favor of each candidate, but omits to state the total number of eligible voters in each craft. Petitioner insists that this is a fatal defect in the certificate, upon the basis of those cases which hold that where a finding of fact of an administrative officer or tribunal is prerequisite to the making of a rule or order, the finding must be explicitly

set out. See *Panama Refining Co.* v. *Ryan,* 293 U. S. 388; *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499; *Atchison, T. & S. F. Ry. Co.* v. *United States,* 295 U. S. 193.

The practice contended for is undoubtedly desirable, but it is not required by the present statute or by the authorities upon which petitioner relies. The National Mediation Board makes no order. The command which the decree of the court enforces is that of the statute, not of the Board. Its certificate that the Federation is the authorized representative of the employees is the ultimate finding of fact prerequisite to enforcement by the courts of the command of the statute. There is no contention that this finding is conclusive in the absence of a finding of the basic facts on which it rests—that is to say, the number of eligible voters, the number participating in the election and the choice of the majority of those who participate. Whether the certification, if made as to those facts, is conclusive, it is unnecessary now to determine. But we think it plain that if the Board omits to certify any of them, the omitted fact is open to inquiry by the court asked to enforce the command of the statute. See *Dismuke* v. *United States,* 297 U. S. 167, 171–173. Such inquiry was made by the trial court, which found the number of eligible voters and thus established the correctness of the Board's ultimate conclusion. The certificate, which conformed to the statutory requirement, was *prima facie* sufficient, and was not shown to be invalid for want of the requisite supporting facts.

*Validity of the Injunction Under the Norris-LaGuardia Act.* Petitioner assails the decree for its failure to conform to the requirements of § 9 of the Norris-LaGuardia Act, which provides: "every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act

or acts as may be expressly complained of in the bill of complaint or petition filed in such case and as shall be expressly included in . . . findings of fact made and filed by the court." The evident purpose of this section, as its history and context show, was not to preclude mandatory injunctions, but to forbid blanket injunctions against labor unions, which are usually prohibitory in form, and to confine the injunction to the particular acts complained of and found by the court. We deem it unnecessary to comment on other similar objections, except to say that they are based on strained and unnatural constructions of the words of the Norris-LaGuardia Act, and conflict with its declared purpose, § 2, that the employee "shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

It suffices to say that the Norris-LaGuardia Act can affect the present decree only so far as its provisions are found not to conflict with those of § 2, Ninth, of the Railway Labor Act, authorizing the relief which has been granted. Such provisions cannot be rendered nugatory by the earlier and more general provisions of the Norris-LaGuardia Act. See the *Railway Clerks* case, *supra,* 571; cf. *Callahan* v. *United States,* 285 U. S. 515, 518; *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S. 1, 22; *International Alliance* v. *Rex Theatre Corp.,* 73 F. (2d) 92, 93.

*Affirmed.*