**BARNES v. PUBLIC BELT R. R. COMMISSION FOR CITY OF NEW ORLEANS.**

Civ. A. 3102.

United States District Court
E. D. Louisiana, New Orleans Division.

Nov. 29, 1951.

W. W. Ramsey, Vicksburg, Miss., Bentley G. Byrnes, New Orleans, La., for plaintiff.

Michel Provosty, New Orleans, La., for defendant.

WRIGHT, District Judge.

This action was filed under Title 45, Section 51, United States Code Annotated by plaintiff against his employer for damages resulting from an accident which occurred while the plaintiff was acting as switchman on the defendant's railroad. The negligence on the part of the railroad is alleged to be the making of an unexpected and unnecessary emergency stop while plaintiff was standing on top of the lead car in a pushing operation involving some thirty-five cars. The defense is no negligence, contributory negligence, and that as to the claim for loss of time, this court is without primary jurisdiction. The issues of fact and law in the case having duly come on to be heard on the pleadings and proof of the parties and due deliberation having been had, I now find and decide as follows:

## Findings of Fact

1. The plaintiff in this action, W. S. Barnes, is an employee of the defendant, the Public Belt Railroad Commission for the City of New Orleans, and the employer-employee relationship thereby created is governed by the Railway Labor Act, 45 U.S.C.A. § 151 et seq., and by the Collective Bargaining Agreement entered into between the defendant and the Brotherhood of Railroad Trainmen.

2. On May 18, 1950 at approximately 4:50 P.M., the switching crew of which Barnes was a member was instructed to take five cars onto the lead track of the railroad yard and push them into gravel 3, a track in said yard.

3. After coupling the five cars, the train consisted of approximately thirty-five cars in all with the five cars in question farthest from the engine. The five cars were not equipped with air brakes. The remaining cars were so equipped.

4. In executing the maneuver Barnes was designated as hind man with a position standing on top of the car farthest from the engine but first in the direction the train was moving. The foreman of the switching crew took his position standing on top of one of the middle cars. The other member of the switching crew was known as the head man and his position was atop the car nearest the engine.

5. Under standard railroad practice in a pushing maneuver as above described, all signals are to emanate with the hind man who communicates them to the foreman, who in turn passes them to the head man, who in turn gives them to the engineer or fireman.

6. At the time of the incident in question all members of the switching crew were standing in their proper positions facing in the direction in which the train was moving. It was the duty of Barnes as hind man to guide the train into gravel 3 and to give the signal to stop the train at the proper time.

7. Several hundred feet before the train reached gravel 3 and while the train was traveling at approximately 6 miles per hour, one Vix, the yardmaster of the railroad yard, unknown to the plaintiff Barnes signaled the foreman of the switching crew to stop the train. Vix's reason for stopping the train was to give the foreman additional instructions. Vix testified that his signal to the foreman called for a routine stop. His demonstration from the witness chair, however, indicated that he gave what was probably interpreted by the foreman of the crew as a wash out or emergency stop signal, both the routine and emergency stop signals being made by simultaneous vertical movements of both arms, the movement in the emergency signal being more accelerated.

8. The foreman relayed the signal to the head man who in turn gave it to the fireman who was then acting as engineer of the train. The signal as first received by the foreman called for routine stop and the fireman applied the brakes on the engine but not the air brakes on the cars. Immediately a further signal was received from the headman by the fireman which he interpreted as an emergency or wash out signal, whereupon an emergency stop was made by applying the brakes not only on the engine but the air brakes on the cars as well.

9. The application of the engine brakes and the air brakes on the cars had the effect of making the engine and the cars with air brakes freeze to the tracks. The five cars at the forward end of the train which had no air brakes, however, continued to roll forward until the slack of about five feet, about one foot from the coupling of each car, was run out, causing those cars to stop with a jerk.

10. Barnes, being unaware of the action of Vix and believing that any stop signal would originate with him, was thrown forward by the train's sudden stop from the middle of the top of the last car on which he was standing to the end of that car, injuring his back.

11. After his fall Barnes resumed his position as hind man and assisted in completing the switching operation which consumed practically twenty minutes, after which, or at approximately 5:15 P.M., he advised the foreman of his switching crew that he had been injured when the train made the stop above described.

12. Barnes was advised by Vix, the yardmaster, to see the company doctor. Instead of so doing Barnes had his family physician come to his home the same evening to treat his back. Barnes remained in bed approximately two weeks as a result of the accident and on June 5th he reported to the company doctor for the first time. The company doctor recog-

nized the back condition for which the family physician had been treating Barnes and advised him that he would not be able to report to work until June 12th. Barnes did report to work as instructed by the company doctor.

13. As a direct result of the accident Barnes lost twenty-five days from work which 25 days loss of time amounts to $306 in salary.

14. Before filing the present action plaintiff, through the Brotherhood of Railroad Trainmen made claim against the railroad for time lost and medical expense incurred as a result of the accident.

### Conclusions of Law

1. Under Title 45, Section 51, United States Code Annotated, this court has jurisdiction of the claim by plaintiff against his employer for damages suffered by him through the negligence of his employer. The Railway Labor Act, 45 U.S. C.A. §§ 151–188, has no application to a claim for damages to the employee resulting from the negligence of an employer railroad. Elgin, Joliet & Eastern Railway Company v. Burley, 325 U.S. 711, 734, 65 S.Ct. 1282, 89 L.Ed. 1886; Virginian Railway Company v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Order of Railway Conductors v. National Mediation Board, et al., 72 App.D.C. 299, 113 F.2d 531.

2. In the circumstances of this case it was negligence on the part of the defendant's yardmaster, Vix, to stop the train.

3. In the circumstances of this case it was negligence on the part of the defendant to make an emergency stop of the train.

4. No negligence on the part of the plaintiff is shown.

5. Plaintiff's damages as a result of the negligence of the defendant are itemized as follows: Pain and suffering $500. Loss of wages $306.

Let a judgment be prepared in accordance with these findings.