DIVISION NO. 14, The ORDER OF RAILROAD TELEGRAPHERS, by R. D. Wilson, et al., for use and benefit of all persons similarly situated, Appellants,

v.

G. E. LEIGHTY, President, The Order of Railroad Telegraphers, H. C. Wyatt, Vice-President and General Manager of Norfolk and Western Railway Company, and Norfolk & Western Railway Company, Appellees.

No. 8357.

United States Court of Appeals Fourth Circuit.

Argued Oct. 12, 1961.

Decided Jan. 3, 1962.

L. S. Parsons, Jr., Norfolk, Va. (Parsons, Stant & Parsons, Norfolk, Va., on brief), for appellants.

A. Paul Funkhouser, Roanoke, Va., for appellees, Wyatt and Norfolk & W. Ry. Co.

Edward J. Hickey, Jr., Washington, D. C. (Joseph L. Kelly, Jr., and Moses Ehrenworth, Norfolk, Va., on brief), for appellee, Leighty.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

SOBELOFF, Chief Judge.

A problem that almost inevitably arises when railroads are merged is how to integrate the seniority rights of the employees of the component roads. One of the commonplace objectives of a merger is to effect more economical and efficient performance through operating changes. Usually some of the operations of one or

the other of the merging railroads are abandoned, and employees are displaced from their customary positions. Congress foresaw just such possibilities when it enacted that the I.C.C., before approving a merger, "shall require a fair and equitable arrangement to protect the interests of the railroad employees affected." 49 U.S.C.A. § 5(2) (f). The I.C.C. has followed the entirely reasonable practice of looking to the employees' bargaining representatives for some measure of guidance. Sometimes, however, while the railroad is indifferent as to how the competing interests of the individual employees are to be adjusted and stands ready to put into operation any arrangement acceptable to the employees, the latter find themselves unable to agree. This is such a case.

The present litigation has its origin in the absorption of the Virginian Railway Company by the Norfolk & Western Railway Company. The telegraphers formerly employed by the Virginian, the "merged railroad," are represented by Division 13 of The Order of Railroad Telegraphers, while those who before the merger were, and still are, Norfolk & Western employees are affiliated with Division 14. The railroad had tentatively agreed that no jobs would be abolished by reason of the merger if the seniority rosters of the two Divisions were integrated in respect to future jobs. However, the two Divisions could not agree on the manner of accomplishing the integration. The dispute centered around the fact that most if not all of the future job opportunities would be on the property of the old Norfolk & Western, to which Division 14 members formerly enjoyed exclusive access. For this reason, Division 14 contended for an integration plan which would deny to Division 13 members any credit for "old" seniority on the Virginian Railway when they bid for jobs outside their old seniority district. This plan, known as homesteading, was to have the same effect on the seniority rights of the members of Division 14 when they bid for jobs on the old Virginian property, but it was, for the reason above

stated, reciprocal in theory only. On the other hand, Division 13 apparently insisted upon a plan, called dovetailing, whereby accrued seniority of all employees would be maintained no matter what jobs were being bid for.

This controversy had not been settled when the Grand Division Convention, described as the "summit of power of the telegrapher's order," met in June of 1960. The Convention authorized the national president, Mr. Leighty, to resolve the dispute, but his efforts at conciliation failed. On August 31, 1960, Mr. Leighty, acting for the national order, entered into a collective bargaining agreement with the railroad embodying a compromise between the extreme positions of the two Divisions. It provided for integration of the seniority rosters of the two Divisions by dovetailing, but required the former Virginian employees to exhaust their job opportunities on their old district before exercising seniority bidding or "displacement rights on the Norfolk & Western vacancies or new positions." Division 14 took an appeal, as permitted in the Convention's resolution under which Mr. Leighty acted, to the Board of Directors which governs between conventions. This body unanimously affirmed the president's action, and an appeal was then noted to the Grand Division Convention which is scheduled to meet in 1964.

On January 13, 1961, District 14 instituted the present suit in the United States District Court for the Eastern District of Virginia. The plaintiffs sought a permanent injunction against the railroad and the parent union to prevent them from acting under the August 31 agreement and, in the alternative, a temporary injunction until the plaintiffs could be heard by the 1964 Grand Division Convention. The District Court dismissed the complaint, both for want of jurisdiction and on the merits. This is the appeal from that action.

The contentions of Division 14 here are the same as before the intra-union agency and the District Court—that its members should not be detrimentally affected by the merger and that the August 31 agree-

ment is unfair because its members will lose job opportunities without, as a practical matter, gaining rights in return. The essential legal argument is that the settlement achieved by the national order through its president, Mr. Leighty, is invalid because the railroad should have bargained with Division 14 rather than with the parent body. Reliance is placed on Article XI, section 16(c) of the union constitution [1] and Rule 18 of the working agreement [2] between Division 14 and Norfolk & Western. We do not reach the merits of this argument,[3] having concluded that this is an intra-union representation dispute and hence not justiciable in the District Court.

The legislative history of the Railway Labor Act, 45 U.S.C.A. § 151 et seq. is carefully traced in Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); General Committee of Adjustment, etc. v. Missouri-Kansas-Texas R., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943); and General Committee of Adjustment, etc. v. Southern Pacific Co., 320 U.S. 338, 64 S.Ct. 142, 152, 88 L.Ed. 85 (1943). This trilogy of cases authoritatively determines that judicial intervention in railway labor disputes is restricted to the narrowest scope; that large segments of this field remain subject to the voluntary processes of conciliation, mediation and arbitration; that particularly in representation disputes the adjudicatory function has been committed by Congress to the National Mediation Board; and that the services of this Board may be invoked for the adjustment of grievances and disputes arising between a railroad and its employees concerning changes in rates of pay, rules, or working conditions not adjusted in conference and not referable to the Railroad Adjustment Board.

The General Committee cases involved disputes between two certified unions, each claiming the authority to treat with the railroad on a particular issue. The railroad having bargained with one, the other brought suit in the District Court to set aside the ensuing contract. The argument was pressed that the contract was invalid because it had been entered into by the railroad with the wrong employee representative and that the District Court had jurisdiction to decide the case because the railroad had thereby violated the express mandate of the Railway Labor Act requiring bargaining with the true employee representative.[4] In rejecting this argument, the Court reasoned that it was clear "from the legislative history of § 2, Ninth [45 U.S.C.A. § 152, Ninth, which vests the Mediation Board with jurisdiction to resolve representation disputes], that it was designed not only to help free the unions from the influence, coercion and control of the carriers but also to resolve a wide range of jurisdictional disputes between unions or between groups of employees." The Court went on to say that "[h]owever wide may be the range of jurisdictional disputes embraced within § 2, Ninth, Congress did not select the courts to resolve them," but "[t]o the contrary, it fashioned an administrative remedy [which] is exclusive." 320 U.S. at 336,

1. This section vests the divisions with authority to "negotiate, make, establish and administer collective bargaining agreements governing wages, rules and working conditions" but also restricts division authority to matters which are strictly intra-divisional. Also, any agreement between a division and the railroad must be approved by the President of the Order.

2. Rule 18 provides: "Seniority rights of men on newly acquired lines shall date on the seniority district to which they become attached only from date of consolidation. In like manner seniority rights of men on the seniority district adopting such line shall apply on the adopted line only from date of consolidation." The plaintiffs do not argue that this provision is not subject to change; they maintain only that the national order had no power to make the change unilaterally.

3. At oral argument, counsel for Division 14 attacked the collective agreement as unfair in operation, but did not assert bad faith or that his clients had been hostilely discriminated against.

4. See 45 U.S.C.A. § 152, Ninth.

64 S.Ct. at 152. The Court ordered dismissal of the cases by the District Court for want of jurisdiction.[5]

█ These decisions furnish the controlling directive for our disposition of the present case. Indeed, Division 14 makes the precise argument to establish federal court jurisdiction that was there rejected by the Court. Although here two separate unions are not involved, the dispute is nonetheless a representational one which falls well within the range of the Court's holding in the General Committee cases.

We must decline to follow decisions of lower courts to the contrary. Railroad Yardmasters of America v. Pennsylvania R., 224 F.2d 226 (3d Cir. 1955); Order of Railway Conductors and Brakemen v. Switchmen's Union, 269 F.2d 726 (5th Cir. 1959). In the Fifth Circuit case the question presented was whether the contract between the railroad and the Switchmen's Union was valid since no notice of the negotiations was given to the Brotherhood of Railroad Trainmen. The controlling issue was, as the Fifth Circuit recognized, whether Brotherhood of Railroad Trainmen or Switchmen's Union was the proper representative. The court held that it had jurisdiction to settle the dispute because it viewed the issue as concerning the underlying validity of the contract, and not its interpretation.[6] The same reasoning appears in the Third Circuit case. Both courts place principal reliance on the language of the Supreme Court in Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 774, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952), to the effect that district courts have jurisdiction to determine the "validity" of a bargaining agreement. However, Howard dealt with an agreement directly violative of the Act, and in view of the General Committee cases, the conclusion is inescapable that district courts have no such authority where "validity" of the contract depends upon the merits of a representation dispute.[7]

5. Decisions of the Supreme Court subsequent to the General Committee cases establish that the National Railroad Adjustment Board is the forum in which jurisdictional disputes should be litigated if they depend for resolution upon an interpretation of existing bargaining agreements. See Order of Ry. Conductors of America v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946); Slocum v. Delaware, L. & W. R., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950).

6. The court viewed the case as not requiring adjudication of a representation dispute, and, therefore, within the rule of Virginian Ry. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), see footnote 7, infra. However, it is apparent from the opinion that there was some doubt as to the bargaining authority of the Switchmen's Union.

7. The only circuit court case found in which the General Committee cases were considered in the context of an alleged representation dispute is Brotherhood of Railroad Trainmen v. Smith, 251 F.2d 282 (6th Cir. 1958). There the court recognized the force of the Supreme Court cases, but convincingly demonstrated that no real representation dispute was involved in its case: The Mediation Board had certified the Order of Railway Conductors and Brakemen as the representative of the conductors and the Brotherhood of Railroad Trainmen as the representative of the trainmen, but Brotherhood of Railroad Trainmen undertook to bargain with the railroad in respect to the seniority rights of conductors. The facts, therefore, brought the case within the purview of Virginian Ry. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), where the Court held that the District Court had jurisdiction to enjoin a contract entered into between the railroad and a company union in disregard of the Federation which had been certified by the Board as the employee representative.

It may also be noted that the Seventh Circuit has held that an intra-union representation dispute which depends for resolution upon an interpretation of the union constitution should be litigated in the state rather than the federal courts. See Peterson v. Brotherhood of Locomotive Fire. & Eng., 272 F.2d 115 (7th Cir. 1959). This conclusion may be at variance with the statute which has vested the Mediation Board with *exclusive* jurisdiction to resolve representation disputes. In any event, that circuit agrees that the federal district courts are without jurisdiction in such matters.

It is suggested that an injunction would merely maintain the status quo pending an ultimate decision by the Convention in 1964. However, an injunction could have no such neutral effect here. It would not merely hold the line, without injury to either party, pending Convention action. Rather, it would reverse irretrievably for the intervening period the action of the Board of Directors and the president, and give to Division 14 the rights it claims to the exclusion of Division 13. Whatever merits this solution may have, a court injunction would not be an act of neutrality.

On the face of things, it would seem appropriate and consistent with national labor policy for a parent labor organization to undertake through its own organizational machinery to remove internal tensions by resolving disputes between two of its subordinate bodies pressing competing claims to work opportunities for their respective members. However, if these intra-organizational efforts are challenged, Board action, not judicial intervention, is indicated.

For these reasons the order of the District Court dismissing the complaint is

Affirmed.