Clarence A. METER, Regional Director of the Eighteenth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MINNESOTA MINING AND MANUFACTURING COMPANY, Respondent.

Civ. No. 3–67–240.

United States District Court
D. Minnesota,
Third Division.

Sept. 6, 1967.

See also D.C. 42 F.R.D. 663.

David R. Hols, Attorney for National Labor Relations Board, Minneapolis Regional office, for petitioner.

Felhaber, Larson, Fenlon & Vogt, by Thomas M. Vogt, St. Paul, Minn., for respondent.

NEVILLE, District Judge.

This cause comes before the court on a petition filed by the Regional Director of the National Labor Relations Board (the Board) requesting a temporary injunction against Minnesota Mining and Manufacturing Company (3M), a Delaware corporation, pursuant to and under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j). The Board charges that 3M is engaging in an unfair labor practice in that it has failed and refused, and still fails and refuses to bargain collectively with two local unions, both affiliated with the Oil, Chemical and Atomic Workers International Union (OCAW), and both duly certified by the Board as bargaining representatives for certain of the employees at 3M's St. Paul and Hastings, Minnesota plants. The Board seeks injunctive relief in this court prior to its own hearing, which is scheduled before a Trial Examiner of the Board on September 6, 1967. Such examiner will hear and make the initial decision on the merits of the charges made by the OCAW locals, which charges were filed with the Board on or about August 2, 1967. Such a determination on the merits is not the province of this court.

Counsel for the Board stated without contradiction in court that the initial determination by the Board's Trial Examiner would not be known for a period of three to six months after September 6th. It further appears that if either side thereafter files appropriate objections, the decision of the Trial Examiner may be referred to a three-member panel of the Board for review. From the decision of such panel of the Board an appeal can then be had to a Circuit Court and it may be that a period as long as two years could elapse before a final binding decision is made. Meantime, and until a decision is final, the Board itself has no enforcement or restraining power. Thus it has applied to this court pursuant to Section 10(j), consistent with what it conceives the congressional purpose to have been when Section 10(j) was enacted.

The unfair labor practice, if such exists, is being carried on in St. Paul and Hastings, Minnesota within this Judicial District and 3M is an employer engaged in commerce within the meaning of the National Labor Relations Act. This court thus has jurisdiction to determine and to pass upon the petition for temporary injunction.

The facts are not seriously in dispute, and were established by the taking of testimony before the court on August 22nd and 23rd, 1967. 3M has approximately 70 plants or business locations throughout the United States. It is a large manufacturer of industrial abrasives, tapes, duplicating equipment and many other products. Something less than 10% of its volume of business is the result of government contracts. It has collective bargaining, agreements or labor contracts with some 55 local unions which are variously affiliated with 20 to 25 different International Unions. The OCAW, the union here involved, repre-

sents employees at eight of 3M's plants. Included in this number is the plant at St. Paul, Minnesota, employing approximately 2,450 employees and the plant at Hastings, Minnesota, referred to as the Chemolite plant, employing approximately 850 employees. The St. Paul local is #6–75 and is the company's largest bargaining unit. The Hastings plant is #6–418 and ranks fifth to eighth in size.

In the past, the labor contracts for these two plants have to some extent, and particularly as to certain major cost items, been negotiated jointly, though each plant has a separate written collective bargaining agreement with each local (Pet.'s Ex. 1 and 2). Both of these agreements expired on August 27, 1967. None of the other labor contracts at other 3M plants expire simultaneously; nor are any now open for bargaining or extension. Collective bargaining negotiations in recent years as to St. Paul and Hastings have occurred in 1957, 1959, 1962 and the last time in May of 1964. The contracts when negotiated have thus been in force and effect for periods of more than one year, the recently expired contracts having covered a period of three years. With minimal exceptions, bargaining has always been completed before contract expiration date.

In June 1967 the locals of OCAW concluded to open negotiations for their contracts in the manner and as provided by the contract terms. There followed a letter dated June 23, 1967 from one of the locals to 3M (Pet. Ex. 3) advising that the present contract was terminated "for the purpose of Negotiation of Additional Benefits pertaining to Wages, Hours, Working Conditions, and Conditions of Employment." The letter contained the following paragraph:

"We also wish to inform you that our Negotiating Committee for the forthcoming Negotiations will at times include certain, Members or Officers of other Labor Organizations. These individuals, when they participate in our Negotiations, will be part of our Bargaining Committee, and will be nego-

tiating only for our Bargaining Unit. We have been advised that we have the Legal Right to include such persons on our Negotiating Committee. If you have any objections to their participation, please let me know immediately so that we can attempt to come to some understanding about this matter before the Negotiations commence."

The testimony is that these representatives, members or officers of other labor unions, were to have no vote on the question of acceptance or rejection of 3M proposals and would be present in an advisory capacity and solely to negotiate for the two local unions involved. A union witness stated that the 3M Company frequently compared current contract suggestions with what the 3M labor contracts and conditions were at other plants in the United States, in some instances presenting prepared charts to illustrate situations existing in other of its plants. It was stated that the union negotiating committee wanted some persons present from one or some of the other plants to verify any such statements and generally to consult and advise based on familiarity with their own contracts and situations.

In prior years, each of the two local unions has been represented by a negotiating committee of nine composed of four officers and five persons elected from the membership plus a representative or representatives from the OCAW International. At times a member of the Industrial Union Department of the AFL–CIO (I.U.D.), Mr. Stephen J. Harris, also has sat and met with the negotiating committees, particularly in discussions with 3M concerning pensions. 3M has not raised, and does not now raise, any objection to such persons joining the local unions' negotiation committee. Counsel for 3M also stated in open court that it had no objection to experts in any particular field sitting in at negotiations, to discuss such subjects as safety conditions, incentive plans, pension, insurance, etc. It does strenuously object, however, to the presence of union officers or members from union locals

with which it has contracts at other of its plants.

It is clear that in earlier years, the two locals had directed a request to 3M for additional union persons at the bargaining conferences but such had been refused. In 1962, three or four representatives of other unions were present in the same hotel as housed the negotiating meetings, but conferred only at recess or overnight with the locals' bargaining committee, and did not actually sit in the room while bargaining and negotiations were taking place.

Following the union letter of June 23rd, the Director of Industrial Relations for 3M replied to the union by letter on July 10, 1967 (Pet. Ex. 4), and stated in part as follows:

"In accordance with our recent telephone conversations, we are prepared to meet under the same conditions as in the past at any time which is mutually convenient to work out a new agreement for St. Paul and Chemolite."

In the interim, on June 27 and again on July 7, the Director of Industrial Relations orally informed union representatives that 3M would not negotiate or bargain with a committee which included officers or members of other unions. Matters culminated on July 14th when, at an arranged meeting, the two locals (apparently contrary to what 3M understood to be a prior commitment) brought into the negotiating meeting after it had progressed for some little time two men from other 3M plants, specifically a member of the Allied Industrial Workers employed at 3M's American Lava Plant, Chattanooga, Tennessee, and a member of the United Glass and Ceramic Workers, with whom 3M has a contract at its Bristol, Pennsylvania plant. Plans apparently were for the attendance of a third man, a member of The Federation of Grain Millers, the union representing the employees at Bedford Park, Illinois, but due to circumstances which are the subject of a separate controversy, he was not present. Almost immediately upon this occurrence, 3M negotiators, headed

by the Director of Industrial Relations, left the meeting. Negotiations have been substantially at a stalemate since. Shortly thereafter the unions filed the unfair labor practice charge with the Board, the hearing on which is set before the Board for September 6th.

■ Both parties are in agreement that 3M, and in fact any employer, has the right to deal and bargain separately with the certified representative union at each plant and is not compelled, and cannot be compelled without its consent, to bargain for several, or all its plants, at one time. So, for instance, if the locals in this case were to decide or attempt to hold out that they would not bargain or sign an agreement until some or all other unions at 3M plants signed similar agreements, such would be per se unlawful. Counsel for the Board put it that a company cannot be forced to bargain outside of the mandatory bargaining unit.

3M asserts that the purpose of the OCAW is to engage in "coordinated bargaining", a step toward ultimate nationwide, or multi-plant bargaining, looking toward the time when one union committee can sit down at one table with 3M and draw one contract covering the workers at all of its plants. 3M has no present intention to consent to any such arrangement. 3M introduced in evidence some excerpts from a publication known as the Collective Bargaining Newsletter, a publication of the Industrial Union Department AFL–CIO, dated as indicated below and reading in part as follows:

Resp.'s Ex. B, December 1965:

"A second move in this area took place late in 1961 when eight international unions having bargaining rights with Minnesota Mining and Manufacturing Co. met under IUD sponsorship to decide on techniques for approaching the company on a national pension plan. The union with the largest membership was the Oil, Chemical and Atomic Workers.

The unions met with the company, which agreed to work out a pattern settlement for the workers at its OCAW plants at St. Paul and Hastings, Minn. Representatives of other unions involved served on a steering committee which advised the negotiators and concurred in the final settlement. The negotiated pattern was then offered to the other unions as their contracts expired. In 1964 this was extended to new insurance patterns, including long-term disability insurance.

The objective at 3M is uniformity of expiration dates on contracts, and complete coordinated bargaining by 1967.

\* \* \* \* \* \*

In some of the coordinated bargaining committees, a steering committee made up of representatives of coordinating locals is established to participate in local negotiations.

The representatives of other unions, at times, have been able to correct or contradict statements made by company representatives concerning practices in their home plants. The ultimate goal of coordinated bargaining is to force companies to negotiate major economic items on a national level."

Resp.'s Ex. C, February 1965, under the headings of

"Coordinated Bargaining Helps Meet A Growing Problem", "Some Examples of Success", and "Similar Benefits in Other Firms":

"At Minnesota Mining and Manufacturing the company agreed to negotiate changes in its national pension plan (a plan which had never previously been negotiated with any union) for two plants of the OCAW. With the cooperation of the IUD and with representatives of 10 other international unions consulting with the negotiators, changes were successfully negotiated. The changes were approved by the other union representatives before they were accepted by the OCAW.

\* \* \* \* \* \*

In two cases, the IUD has been successful because of its committees in securing national bargaining with large companies."

Resp.'s Ex. D, January, 1967:

"The year 1967 promises to be one of considerable collective bargaining activity throughout the nation. Expectations also are that coordinated collective bargaining techniques will gain increased attention during the year.

At Minnesota Mining & Manufacturing, representatives of all plants are expected to join in negotiations on a pension plan for which the first negotiated improvements were won four and a half years ago. Several major collective bargaining agreements covering 3M employee groups also will come up for negotiations during the first part of the year."

These excerpts are for the most part in the frame of reference of pension plans. Though not emanating from either of the locals here involved, these excerpts were admitted into evidence by the court because it appears that Lloyd E. Bristow, an International Representative for OCAW since January 23, 1967 and who was previously President of the Hastings local, had attended the meeting of July 14th as a member of the locals' bargaining committee. He "recently was made Assistant Coordinator for the 3M–IUD [Industrial Union Department AFL–CIO] Coordinated Bargaining Program" (Resp.'s Ex. A). Further, it appears (Resp.'s Ex. K) that one Anthony Lattanzio of Bedford Park, Illinois, had intended to attend negotiations in St. Paul to participate in *coordinated bargaining*, especially concerning company-wide pension program".

Excerpts from certain depositions were read into the record:

Deposition of Stephen J. Harris, Assistant Director of Collective Bargaining Services Section, Industrial Union Department, AFL–CIO:

" \* \* \* We realized that our long term goal, because, you know, our

hope is to get the law changed to permit us to have national bargaining on national issues with companies like GE and Westinghouse and others which have a single pension and single insurance.

Until the law is changed we know, unless the company agrees to these things, we can't do it. The law is specific. Even in the Standard Oil —I mean the American Standard decision it says the general counsel admits that the company could not be forced into international bargaining. All right. That's the law. Our hope is to get the law changed some day.

\*　　\*　　\*　　\*　　\*　　\*

Q Referring to a statement which appears on page 12 of Deposition Exhibit No. 2, reading as follows, 'The ultimate goal of coordinated bargaining is to force companies to negotiate major economic items on a national level.' Does that statement correctly set forth the position of the IUD relating to the goal of coordinated bargaining?

A Well, except for the word 'force'. I would say that the ultimate goal of coordinated bargaining is to get national bargaining with corporations that are national corporations on the issues which are determined nationally by the corporation itself either by getting an agreement as we did with American Home products, to do it that way, or by getting the law—by convincing Congress that the law ought to be changed."

Deposition of Frank Mazurkiewicz, President of the local at the 3M St. Paul plant:

"Q Well, going back, I believe, you stated that it was determined after the IUD meeting in April of 1967 that representatives of other labor organizations should be invited to participate in the 1967 3M negotiations, is that correct?

A That's correct.

Q And were they to be a part of the OCAW negotiating committee?

A No. They wouldn't be a part of the negotiating committee; they would just be there to observe. They would not have any voice or vote. They would be there just for assistance on the basis that they have been in other Minnesota Mining negotiations. If there was things to be said to us that were not accurate as far as they could remember at their negotiations they would more or less relate this information to us.

Q So these people were not a part of the formal negotiating committee selected by the OCAW, is that correct?

A That's right,"

\*　　\*　　\*　　\*　　\*　　\*

Q I just have a few questions here. I believe that you testified that these representatives from other international unions were not to be a part of your bargaining committee this year?

A Yes.

Q Did you mean the formal committee of nine?

A Right.

Q They were not to be a part of that committee?

A That's right.

Q Were they to be a part of the bargaining committee informally?

A No. They are not going to be no part of the bargaining committee whatsoever.

\*　　\*　　\*　　\*　　\*　　\*

Q These representatives or their unions also have collective bargaining agreements with 3M at other plants, isn't that true?

A True

Q And they would have an interest in the 3M negotiations because of the fact that they also have contracts, isn't that true?

A True

Q So that when they appear during the course of the 3M negotiations they are actually representing their own local unions rather than the oil, chemical and atomic workers, right?

A Right.

\* \* \* \* \* \*

Q Now, Mr. Mazurkiewicz, I'm still not convinced that the record shows what you are trying to say. You say they were here to assist. Who were they here to assist?

A They were here to assist St. Paul and Hastings in the negotiating of their contracts.

Q When you say they are not a part of the bargaining committee, by that do you mean they wouldn't have the right to control the settlement by voting on it?

A That's right. They have no voice whatsoever.

Q Are they here to assist anyone other than the St. Paul and Hastings locals?

A No

Q Are they here to bargain for anyone other than the St. Paul and Hastings locals?

A No."

Deposition of Dale Eggers, Vice President local at Hastings, Minnesota:

"Q What was the discussion that took place regarding the question of having other persons from other labor organizations participate as part of their negotiating committee?

A Our negotiating committee and our members of the negotiating committee have long felt that we, as individuals from the rank and file, are not qualified, fully qualified, in all phases of negotiations including pensions, hospitalizations, detailed, intricate parts of negotiations to do our members a full justice in these fields and we felt that we should have the right and fair negotiations with a company to get advice or experts in these fields to advise us.

\* \* \* \* \* \*

Q I want to make sure the record is clear as to just what the status of these representatives from other unions would be. Would they have any direct vote on whether to accept or reject a company proposal?

A No.

Q Has your union made any commitment or agreement to these other unions that you will not agree to any particular terms without their approval?

A Absolutely not.

Q Are you aware of any program or coordinated bargaining with respect to the current negotiations?

A The affect of the current negotiations, none."

Mr. Lloyd E. Bristow testified on the stand as an International representative of OCAW, and former president of Local 418 at Hastings. He testified as follows:

Q What was the discussion on that?

A The discussion was that their status would be only there to give advice and to consult, and if there was any questions asked about the conditions at their plant, or if there was anything that the company may have said concerning conditions at their plant, they could answer these and tell us whether or not these were factually true.

\* \* \* \* \* \*

Q Was it decided whether or not these additional representatives would have any vote on the employer's contract proposals?

A Yes, this was taken up.

Q What decision was made?

A That they would not have any vote.

Q Did your union make any agreement that these individuals or anyone else must approve your contract settlement before you would agree?

A No."

From the above quotations and excerpts of testimony there can be little question but that some of the members and leaders of the union would desire, and it is their ultimate objective, to attain in the future nationalized or multi-plant bargaining. They appear to recognize the present law, however, and it cannot be said that there is any substantial evidence that the particular locals in this case are attempting by inviting in "outsiders" illegally to force or coerce 3M, or to do anything unlawful and are merely desirous to secure assistance and advice. It is true, of course, that much the same advice could be obtained by proximate location of "outsiders" without their actual presence at the bargaining table. 3M's Industrial Relations Director acknowledged that no member of the OCAW or of the I.U.D. had ever stated in his presence an intention to coerce 3M into national bargaining. Rather he concludes and infers this from other facts and circumstances.

Although witness Mazurkiewicz stated at one time that the "outsiders" would be representing their own unions, in fact he later said they would not be bargaining for anyone other than the St. Paul and Hastings local. Indeed the thrust of the evidence is to this effect, and efforts to convince the court that by inviting in outsiders the two locals intend to force or coerce 3M are not persuasive.

The first legal question for the court's determination is whether there is reasonable cause to believe that an unfair labor practice has been and is being committed. Stated another way, are there reasonable grounds to believe that the Board will, following its hearing on September 6th, find that 3M is guilty of an unfair labor practice in refusing to bargain collectively in good faith with union representatives and if such be the finding and it be appealed, will a Circuit Court affirm the Board in its holding? Again, this court is not called upon to decide the merits of the controversy, but in reality merely to determine whether the Board has made a *prima facie* case that an unfair labor practice is being and has been committed. It was said in Local Joint Bd., Hotel & Restaurant Emp. & Bartenders Intern. Union v. Sperry, 323 F.2d 75 (8th Cir. 1963), a case wherein the Board sought an injunction against the union under Section 10(*l*) of the National Labor Relations Act—similar in many ways to Section 10(j):

> "The Board need not show that an unfair labor practice has been committed, but need only demonstrate that there is reasonable cause to believe that the elements of an unfair labor practice are present. Nor need the Board conclusively show the validity of the propositions of law underlying its charge; it is required to demonstrate merely that the propositions of law which it has applied to the charge are substantial and not frivolous."

To the same effect see McLeod v. Compressed Air, Foundation, etc., Workers Local No. 147, 292 F.2d 358 (2d Cir. 1961).

The National Labor Relations Act provides, 29 U.S.C. § 158(a) (5):

> "It shall be an unfair labor practice for an employer * * * to refuse to bargain collectively with the representatives of his employees * * *"

and in 29 U.S.C. § 157 that:

> "Employees shall have the right * * to bargain collectively through representatives of their own choosing * * *"

Interpreting this language literally, the unions may select union members, or union officers, or lawyers, or outside laymen, or anyone to represent them at the bargaining table; as indeed 3M can select whom it wishes on its bargaining committee. The union can no more dictate to 3M that it must or must not have certain people in negotiating sessions than can 3M dictate to the union. It is clear from the above that failure to bargain in good faith, at least without adequate reason therefor, is itself, an unfair labor practice. N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

A reading of the N.L.R.B. decisions on the point, as affirmed by the Circuit Courts leads this court to the firm conclusion, based on the Board's past precedents, that in all probability the Board will find the existence of an unfair labor practice on the part of 3M.

In Standard Oil Co., 137 N.L.R.B. 690 (1962), the Board found that the local union had the right to invite in others to the bargaining table even though they were members of other unions at other plants of the employer. Similarly in American Radiator and Standard Sanitary Corp., 155 N.L.R.B. 736, 60 L.R.R.M. 1385 (1965), the Board held that an unfair labor practice existed when the company refused to bargain because the union had selected some members of other unions from some of the employer's other plants to represent it and to sit at the bargaining table. The Board order enjoined the company from:

"Refusing to bargain with the Union by declining to meet with the selected negotiating committee of the Union because of the presence of any representatives of other unions whom the Union has invited to attend the negotiations for the purpose of participating in the discussion and advising or consulting with the Union."

In both of the above cases, the "outsiders" were members of the union at another plant of the employer. The *Standard Oil* case was affirmed and enforced by the Court of Appeals for the Sixth Circuit, Standard Oil Co. v. N.L.R.B., 322 F.2d 40 (6th Cir. 1963). The court stated under circumstances where it seems to the court there was much stronger evidence of the union's intentions than in the case at bar:

"At any rate, Standard refused to bargain before there was evidence that the temporary International representatives were intent upon doing anything but participate in the bargaining on a refinery by refinery basis as auxiliaries of the respective certified representatives."

The *American Radiator* case denied enforcement but on other grounds. American Radiator & Standard Sanitary Corp. v. N.L.R.B. & Standard Allied Trades Council, 381 F.2d 632 (6th Cir. 8/8/67). The court in that case said, however, by way of dicta:

"* * * we have held that a union has the right to select outsiders to sit in and assist a local bargaining committee."

In this case again the showing of the purpose and intent of the union was, the court believes, stronger than in the present case.

In McLeod v. Gen. Electric Co., 257 F.Supp. 690 (S.D.N.Y.1966) the local union added to its negotiating committee one member from each of seven other unions (p. 700) and the employer refused to meet and negotiate. A Section 10(j) injunction was granted by the District Court. On appeal, the finding of reasonable cause to believe the existence of an unfair labor practice for refusal to bargain was not disturbed by the Circuit Court. The Circuit Court did, however, reverse the order granting an injunction. McLeod v. Gen. Electric Co., 366 F.2d 847 (2d Cir. 1966).

Inasmuch, then, as there is in this court's opinion good and reasonable cause to believe that the Board will find an unfair labor practice on the part of 3M and will be affirmed by the Circuit Court, the bothersome question arises as to whether this court should now exercise its powers to enjoin and in effect issue what would constitute a mandatory injunction. On this question the Supreme Court has considered the *Gen. Electric* case twice recently. In McLeod v. Gen. Electric Co., 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588; 87 S.Ct. 5, 17 L.Ed.2d 45 (1966) Mr. Justice Harlan granted and entered a stay of the judgment of the Circuit Court which had set aside the temporary injunction granted by the District Court, stating:

"* * * The underlying issue in this case—the standards governing the application of § 10(j)—has not hereto-

fore been passed upon by this Court and is of continuing importance in the proper administration of the Labor Act. In light of the District Court's findings of fact, which were not disturbed by the Court of Appeals, petitioner's position as to such standards cannot be deemed insubstantial. * * "

The stay thus left in force the District Court injunction. Thereafter the Supreme Court granted certiorari. McLeod v. Gen. Electric Co., 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967). This indicates that the Supreme Court thought the question important, and the action of the Circuit Court in setting aside the injunction worthy of review. Before final decision, however, the certioraried case became moot, because General Electric Company and the union had entered into a new three-year collective bargaining agreement. The Supreme Court thus remanded the case to the District Court for reconsideration in the light of this supervening event. In doing so the Court stated anent our troublesome question:

"The District Court and the Court of Appeals differed regarding the proper standard which should be determinative of the right to injunctive relief under § 10(j). The District Court applied a dual test: (1) whether 'the impact upon the public interest is grave enough to justify swifter corrective action than the normal process of Board adjudication and court enforcement,' and (2) 'whether the Board has "reasonable cause to believe" that the accused party has been guilty of unfair labor practices.' The Court of Appeals on the other hand considered the proper standard to be whether the Board had 'demonstrated that an injunction is necessary to preserve the status quo or to prevent any irreparable harm.'

We do not think it appropriate however to decide at this time the proper construction of § 10(j)."

We are thus left at this point in time with no authoritative Supreme Court guide as to the proper standard to govern Section 10(j) cases, with the inference perhaps created by the granting of certiorari, that the rationale of the Second Circuit decision is at least subject to review; nor did the Supreme Court in its brief opinion necessarily indicate that either of the standards mentioned is the correct one.

■ It seems to the court that the instant case can be said to meet the standards adopted by both the District Court [1] in the *Gen. Electric* case as well as the standard adopted by the Circuit Court. To some extent the problem may be one of semantics. Perhaps the District Court language "the impact upon the public interest" is close to being synonymous with the Circuit Court's use of the term "to prevent irreparable harm".

The only standard set forth in Section 10(j) itself, however, is that the court "* * * shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems *just and proper*".[2]

1. The suggestion that Congress under Section 10(j) invested the Board in the first instance with a discretion to apply to the court for injunctive relief, and that when this is exercised by the Board the court should give it some or the same weight that is given the determination of an administrative tribunal is not sound. On the other hand, this court is not impressed by the pique which was expressed in the *Gen. Electric* case directed toward the delays in Board action and procedure.

2. Section 10(*l*) of the Act contains this language "No temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable * * *". A possible argument can be made from this that since it is only in connection with ex parte orders that the words "irreparable injury" are used and since such words do not appear in Section 10(j) at all, nor otherwise in Section 10(*l*), that Congress did not intend that "just and proper" should encompass "irreparable injury" or irreparable harm.

If this court does not act affirmatively to enjoin, one course ultimately open to the union is to strike, with all of the well known and devastating consequences of work stoppage. In court, two members of the union on the stand posed no direct immediate threat that the union would strike, the testimony being confined to the generalization that there is always talk among the membership of "no contract—no work", and that the rank and file were "not very much in agreement with granting the two committees power to extend the contract" to September 17th. It was made clear that in all probability there would be no further extension agreed to by the union. At this stage the matter has not been submitted to the union membership, however, and no one can now accurately predict that a strike will or will not occur. Were there a serious threat of an immediate strike, such to this court would qualify, under any test as gravely affecting the public interest. The gist of the contrary argument is based in part on the fact that the union and 3M have agreed to extend the contract to September 17th; that if the court denies the injunction, the parties have agreed to bargain without the outsiders being present; that if the injunction is granted, 3M will negotiate with the outsiders being present. If no agreement is reached, however, by September 17th, there is no indication as to what will occur. In view of the fact that already the contracts have expired and are only temporarily extended, and having in mind the Congressional purpose in adopting the National Labor Relations Act to secure labor peace, it would seem that this situation poses a threat "upon the public interest * * * grave enough to justify swifter corrective action * * *" than the Board can mete.

If this court does not act affirmatively to enjoin, another course open to the union will be to negotiate without the aid and assistance of outside representatives. If such be done and ultimately, a year or two from now, it is determined that the union had the right to have outsiders present, the union will have been deprived of its then determined clear, legal right. A new contract will have been negotiated for a period of two or three years. Any attempted action at law for damages later cannot help but be abortive, if for no other reason than inability to prove actual damage. Indeed it would be difficult if not impossible a year or two years from now for anyone to sue 3M on the grounds that each of some 3,300 men have suffered somewhat or in some particular due to the absence of the outsiders at the bargaining table to aid and advise them. Since it is more than reasonably clear that in all probability such will finally be determined to be their legal right, failure to adjudicate accordingly at this stage will be irreplaceable, will be lost forever and will be something the union cannot achieve or retrieve two or three years from now when the contract again is up for renewal. This can be said to constitute irreparable harm and injury to the union and its members by the deprivation of its legal rights, for the protection of which it has no place to turn except this court. Thus the Circuit Court standard in the *Gen. Electric* case can be said in this sense to have been met.

■ The traditional and historic reason for any court's hesitancy and caution in granting a temporary injunction is that it results, in effect, in a prejudgment of the case without a full hearing and often is based in part merely on affidavits of those involved and statements of counsel made in court. Because the person enjoined thus may be deprived of his legal rights, the doctrine has developed that the restraint of an injunction will not be levied unless the applicant therefor can show irreparable injury. It would seem to this court, in an effort to balance the equities, that to the extent that the right of the applicant is clear, the less the showing of irreparable injury is required; the greater the certainty and clarity of petitioner's rights, the smaller the quantum of proof of irreparable harm is required—especially in a case where as here a later suit for damages is bound to be unavailing. Here

then, if it can be said as the court believes, that on the merits the union will prevail, then the showing of irreparability is materially lessened, perhaps even to the point of disappearance.

■ While respondent employer suggests that the instant case lacks the element of irreparable injury traditionally prerequisite to the issuance of injunctive relief, it should be noted that many courts dispense with this requirement altogether in analogous situations. For instance, numerous decisions have disregarded the irreparability question when the government petitions for equitable relief pursuant to specific statutory authority.[3] Such authority is present in this case under Section 10(j). Moreover, the general public interest weighs heavily in disposing of injunctive requests. In Virginia Ry. v. System Fed. No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937), the court expressed this weighing in stating that:

> "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved. * * * The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief."

Other decisions have echoed this same public interest factor in considering the propriety of equitable relief.[4] Since in the present case the Board petitions under explicit statutory authorization, the rationale of the above lines of cases appears persuasive.

The court has heard long and earnest argument that all that the court should do in 10(j) injunction cases, and in this one particularly, is to preserve the status quo—nothing more; that if the union has a legal right, it will be established in due course; that to require 3M to bargain with "outsiders" present at the bargaining table changes the status quo and is thus beyond the province of the court. Counsel has cited a number of cases using language to this effect and where the injunctive action, when taken, did in fact maintain status quo. In many of these, rival unions or alleged bargaining agents were involved, and the legal rights were not nearly as clear as in this case and thus the court limited itself to a restoration of status quo. Two observations may be made:

First—the evidence demonstrated that labor relations between 3M and the two locals has been excellent and representative of continued good faith on the part of both parties; that in 20 years, except for an original recognitional strike, there has been only one work stoppage, and that for a brief period at one plant for a six-hour shift; that contract negotiations are usually started a month or six weeks prior to expiration and have but rarely gone beyond expiration. This is an admirable situation, and one certainly to be preserved. Since this controversy has arisen, however, it might well be determined that the status quo which the court is called upon to preserve is that peaceable, desirable, continuing relationship and status which has lasted for so many years and that failure to grant the injunction for that for which there is reasonable cause to believe the union has a legal right, may disrupt the status quo in this sense. A sore has developed, an interruption has occurred in this status quo which the union thought important enough to cause the filing of a complaint with the Board. It seems desirable, if possible, to preserve this.

---

3. See, e. g., Shafer v. United States, 229 F.2d 124 (4th Cir. 1956); F.T.C. v. Rhodes Pharmacal Co., 191 F.2d 744 (7th Cir. 1951); S. E. C. v. Torr, 87 F. 2d 446 (2d Cir. 1937) (dicta). See also, Lenroot v. Interstate Bakeries Corp., 146 F.2d 325 (8th Cir. 1945).

4. See, Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Scripps-Howard Radio, Inc. v. F.C.C., 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); F.T.C. v. Rhodes Pharmacal Co., 191 F.2d 744 (7th Cir. 1951).

Second—to adhere strictly to the status quo idea would lead to the result that the court could never or at least rarely enjoin an unfair labor practice of omission, but only of commission. Failure to act would in most instances leave things in status quo. This doctrine seems to the court to be open to question. 3M cites certain cases in which injunctions pursuant to Section 10(j) of the Act were granted.[5] It is urged that the preservation of the status quo was the compelling factor in the issuance of the injunction in each of those cases. In two of the cases, however, Brown v. Pacific Telephone & Telegraph Co. and Douds v. International Longshoremen's Ass'n, the respective courts made no mention whatever of the maintenance of the status quo as constituting a binding prerequisite to a finding that a preliminary injunction was just and proper under the circumstances. In all of the cited cases, save McLeod v. Compressed Air Foundation, Tunnel, etc., Wkrs., the injunctions were issued primarily to insure the orderly and lawful transition, if such were ultimately to occur, from the recognition of one union or bargaining unit to another, following recognitional disputes and coercion and intimidation relating thereto.

In conclusion, the court has attempted to balance the equities to determine the harm to 3M when an injunction issues. It would seem that nothing irreparable can come to 3M if the Board ultimately decides on the merits in its favor and thus the injunction becomes dissolved. Even though in 1967, three additional people sat at the bargaining table with no vote, and negotiated only for the two locals involved, no great injury can have occurred. Perhaps 3M feels that if it proceeded to a bargaining session with the "outsiders" present without a court injunction, it would in some way be consenting to such practice, would in some way be waiving a right by altering an established pattern. If so, its reluctance to do so is understandable. Both sides agree that nationwide or multi-plant bargaining cannot take place without consent of the parties and would be illegal if attempted to be forced by the union. Thus perhaps, the unwillingness of 3M to be deemed to have consented since it objects to any such format. Obeying an injunction of course cannot be deemed in any way a consent on the part of 3M should the Board ultimately uphold 3M's position.

The injunction should provide that:

(1) It shall be in force and effect only until a final disposition of the case before the Board or a determination by the Board (and the courts if appealed) on the merits of the issues involved and shall automatically then be dissolved.

(2) It shall restrict the two local unions to the presence at negotiations of not more than three selected officers or members of other unions plus, as in the past, a representative of the Industrial Union Development Department of AFL-CIO and the usual member or number of members of OCAW International. The case has arisen in this court because of the presence of two men brought into negotiating sessions by the union; apparently a third had been expected. The court bases its temporary injunction on the presentation of these facts. Perhaps the Board ultimately will allow more in attendance, but for the interim and until a decision on the merits the number should be limited to the facts presented before the court.

5. Johnston v. Evans, 223 F.Supp. 766, (E.D.N.C.1963); Fusco for and on Behalf of N. L. R. B. v. Richard W. Kaase Baking Co., 205 F.Supp. 465 (N.D.Ohio 1962); Brown v. Pacific Telephone & Telegraph Co., 218 F.2d 542 (9th Cir. 1955); Douds v. International Long-shoremen's Ass'n, 241 F.2d 278 (2d Cir. 1957); McLeod v. Compressed Air, Foundation, Tunnel, etc., Wkrs., 292 F. 2d 358 (2d Cir. 1961); Brown v. National Union of Marine Cooks & Stewards, 104 F.Supp. 685 (N.D.Calif.1951).

(3) It shall be limited and apply only to negotiations with the St. Paul and Hastings locals and have no application to other 3M plants or locations.

(4) It shall prohibit other union members sitting with the bargaining committees from having any vote on acceptance or rejection of proposals and shall confine their activities solely to assisting and advising and negotiating for the two local unions and not for their own unions.

This opinion shall serve as findings of fact and conclusions of law. An injunctive order in accordance with this opinion has been filed with the Clerk of this Court.