**UNITED STATES of America,
Plaintiff,**

v.

**STOECO HOMES, INC., a corporation, Defendant.**

**Civ. A. No. 1335–72.**

United States District Court,
D. New Jersey.

June 13, 1973.

---

this action for improper venue in this forum.

Herbert J. Stern, U. S. Atty., by Z. Lance Samay, Asst. U. S. Atty., Newark, N. J., for plaintiff.

Joel A. Mott, Jr., Ocean City, N. J., for defendant.

## OPINION AND ORDER

COHEN, Chief Judge:

In this environmental protection action plaintiff, United States of America, seeks a permanent restraining order, enjoining defendant, Stoeco Homes, Inc., from conducting dredge, fill and construction operations in an area of Ocean City, New Jersey, bordered by Bay Avenue, Tennessee Avenue, Spruce Road and the Back Thorofare sector of the Intracoastal or Inland Waterway.

This Court has jurisdiction, pursuant to the provisions of 28 U.S.C. §§ 1333 and 1345 and 33 U.S.C. §§ 403, 406, 407, 411 and 413.

Plaintiff contends that this area is part of the navigable waters of the United States and that since at least April 23, 1971, defendant has conducted these operations, without the prior approval of the United States Army Corps of Engineers (ACOE) and the Secretary of the Army, in violation of 33 U.S.C. §§ 403 and 407. It is further alleged that these operations constitute a public nuisance in violation of federal common law and that they have irreversibly altered the natural condition of the development site and irreparably damaged the environment.

Defendant responds that it has not conducted its activities within the navigable waters of the United States, and, alternatively, that even if it has operated in navigable waters, it has not violated federal law because its operations were conducted in an area shoreward of federally established or federally approved New Jersey State harbor lines where, it contends, a permit is not required. Defendant also denies that it has irreversibly altered the natural condition of the area or irreparably caused any harm to the environment. The defenses of estoppel and laches are also asserted against the Government, as well as unconstitutional violations of equal protection in the inconsistent enforcement of the statutes.

The facts out of which this controversy arose are as follows:

Sometime in 1965 defendant, a corporation under the laws of the State of New Jersey, commenced dredging, filling and construction activities, including bulkheading, road construction and housebuilding, in the above-described area of Ocean City, New Jersey. This area, which defendant designated as Plan No. Six of Stoeco Riviera (Plan Six), is a lagoon development comprised of several man-made building lots and nine basically similar finger lagoons which perpendicularly radiate from a main channel known as South Harbor. All of these lagoons, including South

Harbor, were artificially created by defendant.

South Harbor, which was dredged in 1955, is approximately 7 to 11 feet deep at low water, 125 feet wide and about one-half a mile in length; it connects at its northwest extension with Back Thorofare and terminates at its southeast extension perpendicularly to Bay Avenue.

That portion of Plan Six which lies to the northeast of South Harbor (the Northeast Sector) encompasses six finger lagoons and seven building lots developed by defendant between 1965 and 1968; and, except for occasional maintenance dredging and the construction of houses and dock facilities, it is now largely completed.

That portion of Plan Six which lies to the southwest of South Harbor (the Southwest Sector) encompasses two and one-half building lots, the three remaining finger lagoons and a large rectangular area (the Rectangle) which defendant intends to convert into three building lots and two lagoons. The proposed development of the Southwest Sector contemplates the creation of five and one-half fairly uniform, artificially-filled building lots, essentially parallel to, and separated by, five completely bulkheaded, man-made lagoons perpendicularly radiating from South Harbor in the northeast and terminating at Tennessee Avenue in the southwest. The actual development of this sector was commenced sometime after March 1971. On April 23, 1971, and on numerous occasions thereafter, officials of the ACOE directed defendant to cease and desist its development activities. Notwithstanding these directives, defendant continued to develop the Southwest Sector until this Court on September 11, 1972, enjoined further development pending disposition of the present litigation.

The present status of this development is as follows:

Parallel to Bay Avenue and adjacent to the one-half building lot which separates it from Bay Avenue is Marcus Harbor, a completely dredged lagoon approximately 125 feet wide, 550 feet long and 9 feet deep at low tide. It has a bulkhead on its southeast exposure to the one-half building lot and a bulkhead on its northwest exposure to a full building lot. At a right angle to the latter bulkhead there exists another bulkhead which runs in a northwesterly direction along approximately ninety percent of the lot's South Harbor exposure.

Immediately to the northwest of this lot is Tonga Harbor, a completely dredged but as yet unbulkheaded lagoon, approximately 125 feet wide, 550 feet long and 11 feet deep at low tide. On its northwest, Tonga Harbor is bordered by the Rectangle, which extends northwestward to Cayman Harbor—the northwesternmost lagoon in the Southwest Sector. Cayman Harbor has a narrow backward width and a width of about 187 feet at its mouth; it is approximately 550 feet long and, at low tide, has a depth of 5 feet near its mouth. It is bulkheaded along its northwest exposure to a building lot which fronts on Back Thorofare, and along its southeast exposure to the Rectangle there is a bulkhead which perpendicularly connects at its northeast terminus with a partially-constructed bulkhead that runs approximately 250 feet southeast along South Harbor to a point where defendant has begun dredging one of the two lagoons it proposes to create in the Rectangle.

The Rectangle itself is almost entirely diked around its perimeter by an embankment comprised of dredge spoils deposited there by defendant in connection with its development of the Southwest Sector. In addition to creating this dike, defendant has filled the area behind it with dredge spoils that defendant's engineer testified were "sucked up through [a] dredge and pumped out a pipe and deposited on the fill area." The water which accompanied this process, as well as those dredge spoils known as fines, which did not settle out onto the fill area, were discharged into Cayman Harbor through four 12-inch run-

off pipes. These pipes protrude through the dike that runs along the southeast side of Cayman Harbor. According to defendant's witnesses, as a result of this discharge Cayman Harbor, which was once completely dredged, has become "unusable as far as boats are concerned; it has to be dredged again." Cayman Harbor now has a depth of zero in the area of the discharge pipes.

Since the time of their creation, all of the lagoons in Plan Six have been navigable in fact, and most have supported various-sized crafts, including fifty-foot ocean-going vessels, as well as, pile drivers and dredges of substantial size. With the exception of periodic obstructions attributable to defendant's dredge, fill and construction activities, they continue to be navigable. These obstructions to navigation result from a number of sources, including: bank failures or dike "blow-outs", i. .e., the collapse of dikes into the water, which occur because defendant has overburdened the fill area with dredge spoils; the erosion of dredge spoils defendant has placed on the banks of these waters due to rain, tides and run-off; defendant's direct discharges of dark sludge material into South Harbor and Cayman Harbor; and the presence of defendant's equipment which has blocked South Harbor during work days.

Such occurrences have frequently caused substantial impediments to navigation. On one occasion a "blow-out" of a dike caused the shoaling of South Harbor to such an extent that it required six weeks of dredging before boats could again pass. During that time, several persons damaged their boats trying to get into the Harbor. Similar obstacles caused by defendant have rendered other lagoons in Plan Six useless for navigation and may, in the future, adversely affect other lagoons as well as the Inland Waterway.

■ South Harbor and its radiating finger lagoons comport in all critical respects with the criteria of navigability established by the United States Su-

preme Court and are, without question, part of the navigable waters of the United States. See United States v. Appalachian Electric Power Co., 311 U.S. 377, 407, 409, 61 S.Ct. 291, 85 L.Ed. 243 (1940); United States v. The Steamer Montello, 87 U.S. (20 Wall.) 430, 441, 22 L.Ed. 391 (1874); United States v. The Steamer Montello, 78 U.S. (11 Wall.) 411, 20 L.Ed. 191 (1871); and The Steamer Daniel Ball v. United States, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871). Also, see United States v. Banister Realty Co., 155 F. 583, 588–593 (E.D.N.Y.1907). These waterways are susceptible of being used in their ordinary condition as highways for commerce. The Daniel Ball, supra 77 U.S. at 563. And, even when they are obstructed by defendant's activities they are, by reasonable improvement, available for navigation within the meaning of the rule of United States v. Appalachian Electric Power Co., supra. See Economy Light & Power Co. v. United States, 256 U.S. 113, 118, 41 S.Ct. 409, 65 L.Ed. 847 (1921); Rochester Gas and Electric Corp. v. FPC, 344 F.2d 594, 596 (2d Cir.), cert. denied, 382 U.S. 832, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965); and Davis v. United States, 185 F.2d 938, 943 (9th Cir.), cert. denied, 340 U.S. 932, 71 S.Ct. 495, 95 L.Ed. 673 (1950).

■■ In addition, Plan Six itself is part of the navigable waters of the United States for the reason that until it was illegally filled in 1927 by defendant's predecessor in title, it was a wetlands area, having an overall elevation below mean high-water, which was interlaced with substantial rivulets regularly flowed by the tides. See United States v. Rands, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); United States v. State of Washington, 294 F.2d 830 (9th Cir.), cert. denied, 369 U.S. 817, 82 S.Ct. 828, 7 L.Ed.2d 783 (1962); and United States v. Joseph G. Moretti, Inc., 331 F.Supp. 151 (S.D.Fla.1971). The fact that this area has been illegally filled does not extinguish its character, in legal contemplation, as part of the navigable waters of the United States,

for an area once found to be part of those waters remains so. *See* United States v. Appalachian Electric Power Co., *supra*, 311 U.S. at 408, 61 S.Ct. 291; George v. Beavark, Inc., 402 F.2d 977, 978 (8th Cir. 1968); Rochester Gas and Electric Corp. v. FPC, *supra*; and Davis v. United States, *supra*. Also, *see* Economy Light & Power Co. v. United States, *supra*, 256 U.S. at 118, 41 S.Ct. 409.

■ Because Plan Six is part of the navigable waters of the United States the Government is entitled, by virtue of an absolute dominant servitude which can be asserted to the exclusion of any other competing or conflicting power over such waters, to regulate its use. *See* United States v. Virginia Electric Co., 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed. 2d 838 (1961); United States v. Twin City Power Co., 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956); FPC v. Niagara Mohawk Power Corp., 347 U.S. 239, 249, 74 S.Ct. 487, 98 L.Ed. 686 (1954); and Gilman v. Philadelphia, 70 U.S. (3 Wall.) 713, 724, 18 L.Ed. 96 (1865).

As part of its regulatory scheme respecting navigable waters, Congress enacted 33 U.S.C. § 403 [1] which prohibits such activities as those in which defendant has engaged in Plan Six, in the absence of an appropriate permit from the Secretary of the Army.

Contrary to defendant's unpersuasive assertions that the ACOE's actions and communications over the course of the last 24 years misled it into believing that it was not required to secure a permit for its operations in Plan Six, the testimony regarding these assertions plainly demonstrates that defendant was aware of this requirement as early as 1949, and that it most certainly knew, at the commencement of its activities in the Southwest Sector, that it needed a permit to develop Plan Six. Nonetheless, it never completed an application for, nor did it ever receive, an appropriate permit to work in this area.

Defendant did receive a federal permit to dredge access channels in the area fronting on the proposed site of South Harbor; however, that application is not pertinent to the issues here under consideration because defendant knew, or should have known, this permit to be of limited scope and duration.

■■ Except for that federal permit which allowed defendant to dredge access channels in front of what is now the entrance to South Harbor, defendant has not obtained any federal permits for its dredge, fill and construction activities in this area, nor have the communications between defendant and the ACOE, over the course of the last 24 years, in any way obviated defendant's obligation to obtain such permits in respect to those activities. Moreover, even assuming that defendant was somehow misled by the ACOE, the Federal Government cannot be prevented from exercising its authority over the navigable waters of the United States by reason

---

1. In its entirety this statute provides:
   *Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in*
   The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

of estoppel, laches or private expenditures founded upon mistaken assumptions. United States v. California, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 91 L. Ed. 1889, Opinion Supplemented, 332 U.S. 804, 68 S.Ct. 20, 92 L.Ed. 382, reh. den., 332 U.S. 787 (1947), pet. den., 334 U.S. 855, 68 S.Ct. 1517, 92 L.Ed. 1776 (1948).

■ The defense of a denial of equal protection in the inconsistent enforcement of the statutes under which this action was brought is totally lacking in merit. Defendant has not in any way substantiated its claim that the Government arbitrarily singled it out for selective enforcement action. *See generally* Oyler v. Boles, 368 U.S. 448, 454–456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). On the contrary, the proofs clearly demonstrate that the Government has administered these laws with complete impartiality and that it has acted to insure compliance with their provisions by all known violators.

■ Defendant argues that the Government established federal harbor lines or ratified State harbor lines and that as a result it was relieved of the requirement to obtain a permit for work done shoreward of those harbor lines. This is incorrect in fact and in law. The Federal Government has not established harbor lines in the Back Thorofare area, nor has it, otherwise, ratified or adopted whatever State harbor lines may exist in this area. The presence of federal harbor lines, however, is irrelevant to the requirement of obtaining an appropriate federal permit for work in navigable waters.

■ Inasmuch as its dredge, fill and construction activities have obstructed, altered and modified the course, location, condition and capacity of Back Thorofare, South Harbor and the finger lagoons which radiate from South Harbor without having obtained proper authorization from the Secretary of the Army, defendant has violated 33 U.S.C. § 403. The enforcement provisions respecting 33 U.S.C. § 403 are contained in 33 U.S.C. § 406.[2] That statute specifically authorizes the district court to order injunctive relief to abate such violations.

The Government, here, seeks a statutory injunction pursuant to 33 U.S.C. § 406. Such applications are considered differently from those made pursuant to Rule 65 of The Federal Rules of Civil Procedure. SEC v. Globus International Ltd., 320 F.Supp. 158 (S.D.N.Y.1970). The Supreme Court consistently has held that where the activity against which the injunction is sought constitutes a violation of a federal statute, the public interest should bear more than traditional weight upon the deliberations of the court, even to the point of slackening the customary equitable criteria. *See* United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); United States v. City & County of San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940); Virginian Ry. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); and 7 MOORE, FEDERAL PRACTICE, ¶ 65.04[1], at 65–45.

2. Every person and every corporation that shall violate any of the provisions of sections 401, 403, and 404 of this title or any rule or regulation made by the Secretary of the Army in pursuance of the provisions of section 404 of this title shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

■ Other federal courts have even further restricted the application of the traditional equitable criteria usually considered in Rule 65 applications, in cases involving statutes which specifically provide for injunctive relief. Where, as here, the activity sought to be enjoined is a violation of a statute, and the statute makes specific provision for injunctive relief, plaintiff need not show irreparable injury to enjoin the violation. This principle has enjoyed wide application involving many different statutes.[3]

Because 33 U.S.C. § 406 makes specific provision for injunctive relief against violations of 33 U.S.C. § 403, the Government need not demonstrate irreparable injury to secure an injunction; it is only required to prove that the statute has been violated. *See* Hecht Co. v. Bowles, *supra*; NLRB v. Aerovox Corp., 389 F.2d 475 (4th Cir. 1967); United States v. Town of Brookhaven, 2 ERC 1761 (E.D.N.Y.1971); and SEC v. Globus International Ltd., *supra*. The Government has proven defendant's repeated violations of 33 U.S.C. § 403 and is, therefore, entitled to a permanent statutory injunction interdicting a continuation of defendant's dredge, fill and construction activities in Plan Six.

■ In addition, because defendant has disposed dredge spoils to the various lagoons in Plan Six and to the Inland Waterway by means of direct discharge, erosion from the banks and fill areas, and the collapse or "blow-out" of dredge-spoil dikes it has violated 33 U. S.C. § 407. *See* United States v. Standard Oil Co., 384 U.S. 224, 227–230, 86 S. Ct. 1427, 16 L.Ed.2d 492 (1966).

■ Inasmuch as these activities adversely affect the navigable waters of the United States by, among other things, impairing the commercial, navigational and recreational use of these waters, and, inasmuch as they constitute an unlawful encroachment upon the public domain, defendant's activities amount to a public nuisance in violation of federal common law and, as such, are subject to abatement at the instance of the Government. *See* Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); New Jersey v. New York City, 283 U.S. 473, 51 S.Ct. 519, 75 L.Ed. 1176 (1931); New York v. New Jersey, 256 U.S. 296, 41 S.Ct. 296, 65 L.Ed. 937 (1921); Georgia v. Tennessee Copper Co., 206 U.S. 230, 238, 27 S.Ct. 618, 51 L.Ed. 1038 (1907); In re Debs, 158 U.S. 564, 65 S.Ct. 900, 39 L. Ed. 1092 (1895); Denney v. United States, 185 F.2d 108 (10th Cir. 1950); United States v. United States Steel Co., 356 F.Supp. 556 (N.D.Ill.1973); Commonwealth v. S. Covington & C. St. R.R., 181 Ky. 459, 205 S.W. 581 (1918); and Attorney General v. Richards, 2 Anstr. 603, 3 Rev.Rep. 632 (Ex. 1795). Note, *Developments in the Law-Injunctions*, 78 HARV.L.REV. 994 (1965).

■ Alternatively, the United States is entitled to a permanent injunction because it has established that irreparable injury to the environment, commerce and recreation has and will result, if defendant is allowed to continue its operations.

### ORDER

In accordance with the views expressed hereinabove, it is on this 13th day of June, 1973 hereby ORDERED, ADJUDGED and DECREED that defendant, Stoeco Homes, Inc., its directors, officers, agents, servants, em-

3. *See, e. g.*, ICC v. Consolidated Freightways, 41 F.Supp. 651 (D.N.D.1941) (the Interstate Commerce Act); SEC v. Globus International Ltd., *supra* (the Securities Act of 1933); Lenroot v. Interstate Bakeries Corp., 146 F.2d 325 (8th Cir. 1945) (the Fair Labor Standards Act of 1938); Shadid v. Fleming, 160 F.2d 752 (10th Cir. 1947) (the Emergency Price Control Act of 1942); Shafer v. United States, 229 F.2d 124 (4th Cir. 1956) (the Agricultural Adjustment Act of 1938); Meter v. 3 M Co., 273 F. Supp. 659 (D.Minn.1967) (the National Labor Relations Act); FTC v. Rhodes Pharmacal Co., 191 F.2d 744 (7th Cir. 1951) (The Federal Trade Commission Act); and United States v. Ingersoll-Rand Co., 218 F.Supp. 530 (W.D.Pa. 1963) (the Clayton Act).

ployees, attorneys, successors and assigns and each of them, and all persons, firms, and corporations acting under, through or for it or in active concert or privity with it, be permanently enjoined and restrained from engaging in or permitting, suffering, or causing, directly or indirectly, any dredge, fill or construction operations in an area of Ocean City, New Jersey, bordered by Bay Avenue, Tennessee Avenue, Spruce Road and the Back Thorofare of the Intracoastal Waterway, without the prior recommendation of the Army Corps of Engineers and approval of the Secretary of the Army.  No costs.